# THE STATE v. WILLIAM RUDOLPH, alias WILLIAM ANDERSON, Appellant.

### In Banc, March 10, 1905.*

1. **NATIONAL CONSTITUTION:** Authority in States: Information. Criminal procedure in the State courts is not regulated by the requirements of the Federal Constitution, but by the Constitution and laws of the State. So that the provisions of the Federal Constitution declaring that "no person shall be held to answer for a capital or otherwise infamous crime, unless on .a presentment or indictment of a grand-jury; . . . nor be deprived of life, liberty or property without due process of law," do not apply to a prosecution for murder in a State court, nor deprive the State of the right to provide that one accused of murder may be prosecuted by an information. Nor does the prosecution of such a person by information deprive him of life or liberty without due process of law. Those provisions of the Federal Constitution are limitations upon Congressional and Federal power, and not upon the powers of the States.

2. ———: ———: ———: **Louisiana Purchase Treaty.** The treaty by which France ceded the Province of Louisiana to the United States provided that "the inhabitants of the ceded territory shall be incorporated in the Union of the United States and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States." *Held,* that this treaty did not, in guaranteeing to the inhabitants of the ceded territory, out of which Missouri was carved, the same "rights, advantages and immunities of citizens of the United States," deprive the State of the right to make indictment and information concurrent remedies for the prosecution of felonies, for the right to be prosecuted in a State court by an indictment only, was not by the Federal Constitution guaranteed to the citizens of any State.

3. **MURDER:** Explaining Presence of Deceased: Warrant for Other Crimes. It was competent for the State, in order to show that the deceased was on the premises where the killing occurred for a.lawful purpose, to introduce in evidence a warrant issued three or four years previously against the defendant for burglary and which was in the pocket of one of the posse at the

---

*Decided first in Division Two, November 22, 1904; transferred to Court in Banc, and divisional opinion adopted February 2, 1905; motion for rehearing filed; motion overruled March 10, 1905.

State v. Rudolph.

time the killing occurred; especially, would such warrant be competent evidence where the defense was self-defense—not to establish his guilt of the offense for which the warrant was issued, but merely to show the authority of the posse to view the premises where the homicide was committed.

> *Held*, by Valliant, J., in a dissenting opinion, that, as the defendant had no knowledge that any member of the posse had this warrant in his possession, it was not competent evidence to prove deceased's lawful presence on the premises, and was not competent for any purpose, and was prejudicial. It was proof of an entirely distinct crime, which was in no wise connected with the one for which he was on trial and in no wise explanatory of that crime, for that crime grew out of a bank robbery committed only a month previous.

4. ———: **Evidence of Other Crime.** In the trial of defendant for murdering deceased while resisting arrest for burglary, admission of testimony concerning the burglary is not error, where the two crimes are so closely connected that proof of the murder could not be made complete without admitting evidence that defendant also committed the burglary—the burglary for which the posse had come to arrest him when he killed one of its members.

5. **SHACKLED WITNESS: Arbitrary Action: Affidavit of Sheriff.** The sheriff filed an affidavit that an accomplice of defendant, who was called by him as a witness, had been convicted of murder and sentenced to be hanged and was in the custody of the law, and that he was a dangerous and untrustworthy person and that affiant had good reason to believe that if he were brought into court unshackled he would attempt to escape. *Held*, that the affidavit alone was sufficient reason for the refusal of the court to order the shackles removed. Aside from that affidavit, the conditions surrounding the trial indicated that there was nothing arbitrary in the action of the court.

6. **MURDER: Armed Guard.** There is nothing prejudicial in the trial court permitting a substantial armed guard to attend a desperate and dangerous defendant during the trial—especially where their conduct is not improper.

7. ———: **Attempt to Arrest: Official Authority.** The failure of a posse to announce their official character and intention to arrest the defendant for a felony, does not justify the killing of one of their number by the defendant.

8. ———: ———: **Announcement: Opportunity.** Before the right of self-defense can be invoked by a defendant charged with murdering a member of the sheriff's posse that were trying to arrest him, it must be shown that they had an opportunity to indicate to him their official character and failed to do so, and

State v. Rudolph.

that that was followed up by an attempt to physically restrain him by force. And where defendant gave them no such opportunity, he is not entitled to an instruction on the subject of his knowledge of the official character of the member of the posse whom he killed.

9. ———: **Instructions for Second Degree Murder.** Where the killing was done with malice and deliberation it was murder in the first degree. And where defendant was clearly guilty of murder in the first degree or entitled to go acquit on the ground of self-defense, the court should give no instructions on the subject of murder in the second degree.

Appeal from Franklin Circuit Court.—*Hon. Wm. A. Davidson,* Judge.

AFFIRMED.

*J. R. Garstang* and *Jas. A. Finch* for appellant; *Jesse H. Schaper* and *Jesse M. Owen* of counsel.

(1)   As one of the principles of the Federal Constitution which was guaranteed to the inhabitants of the Louisiana Territory, was that no person should be held to answer for a capital or otherwise infamous crime, except by presentment or indictment of a grand jury, the amendment to the Constitution of Missouri giving the prosecuting attorney power to issue informations in felony cases, is in conflict with the fifth amendment to the Constitution of the United States, by reason of the third article of the treaty of cession between the United States and France ratified in 1803, and is in conflict with the fourteenth amendment to the Constitution of the United States because it abridges the privileges and immunities of citizens of the United States. It is apparent that it does abridge the privileges and immunities of citizens of the United States, because if this prosecution was for treason against the Federal government, the defendant would be protected by the fifth amendment; therefore, to prosecute this defendant, who is an inhabitant of the Louisiana Terri-

tory, by information of the prosecuting attorney, is to deny him one of the privileges and immunities which is guaranteed him by the supreme law of the land. Constitution of Missouri, art. 2, sec. 12; fifth amendment to the Constitution of the United States; fourteenth amendment to the Constitution of the United States; third article of the treaty of cession between the United States of America and the French Republic, ratified April 30, 1803. (2) The court erred in admitting in evidence, over defendant's objection, the warrant issued by Edward Winkelmeyer, a justice of the peace, for the arrest of defendant on a charge of burglary of the dwelling of one J. A. Swartz, and the testimony of Edward Winkelmeyer in connection therewith, as the crime charged in the warrant is wholly distinct and in no way connected with the crime charged in the information, as the crime of said burglary is alleged to have been committed in January, 1899, about four years before the alleged commission of the crime with which defendant stands charged. The general rule undoubtedly is, that a distinct crime, unconnected with that laid in the indictment, can not be given in evidence against the prisoner. 1 Greenleaf on Ev., note to sec. 53; Bank v. Bank, 64 Mo. App. 253; Swan v. Com., 104 Pa. St. 218; Com. v. Jackson, 132 Mass. 16. Opening the door for the admission of any evidence seeking to connect defendant with any other crime than that with which he stands charged, robs him of that fair and impartial trial so sacred to our laws. (3) The court erred in permitting the State, over defendant's objection, to introduce, and put before the jury a document purporting to be the affidavit of Esther Rudolph, the fourteen-year-old sister of defendant, for the purpose of impeaching her testimony given on the witness stand, after she admitted that she signed the writing and had sworn to it, but stated that the contents of the purported affidavit were false, and that the statement therein had been obtained by threats and in-

timidation. When she admitted that the statements contained in the writing had been signed by her and that the same were false, the impeachment was complete and the introduction of the admittedly false statements could have no other effect than to poison the minds of the jury, by holding up to ridicule the defendant's witness, and thereby injuring the defendant. The court erred in permitting the State's attorney to cross-examine Esther Rudolph in regard to the statements contained in the purported affidavit made by her, by asking complicated questions which she did not understand, and which only confused her, and tended to convey the impression that she was not telling the truth. In Schmidt v. Railroad, 149 Mo. 269, it was held that a rigid cross-examination of a little girl fourteen years old, which tended to confuse her and tended to affect her credibility, was in itself sufficient grounds for reversal of a judgment rendered against the plaintiff for whom she was a witness. (4) The court erred in overruling defendant's motion to order the shackles removed from the hands and wrists of George Collins, while he was on the witness stand testifying in behalf of defendant. State v. Kring, 1 Mo. App. 438, 64 Mo. 592. (5) It was error to permit an unnecessary number of armed guards to attend the defendant during his trial. State v. Kring, 64 Mo. 591. According to the testimony of E. C. Steinbeck, there were from six to ten guards in the court room during his trial. (6) The court erred in failing to instruct the jury in relation to defendant's knowledge of the official character of Charles J. Schumacher and those acting with him in attempting to arrest the defendant. State v. Underwood, 75 Mo. 238; State v. Bateswell, 105 Mo. 614; 1 Whart. Crim. Law, sec. 419. (7) The court erred in refusing to instruct on murder in the second degree. State v. Hill, 69 Mo. 451; State v. Robinson, 73 Mo. 308; State v. Talbot, 73 Mo. 347; State v. O'Hara, 92 Mo. 65; State v. Curtis, 70 Mo. 600.

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

(1)    The fifth amendment is not a limitation upon the criminal procedure in the several States. It is a limitation only upon Congressional power. Nor is a proceeding by information a denial of due process of law, within the meaning of the fourteenth amendment. State v. Jones, 168 Mo. 402; Hurtado v. California, 110 U. S. 516; Hodgson v. Vermont, 168 U. S. 262; State v. Jackson, 21 L. R. A. 574; Nowles v. State, 24 Ala. 672; Traichel v. Commonwealth, 7 Wall. 321; Rowan v. State, 30 Wis. 129.    (2)    The admission of the evidence relative to the burglary of the Bank of Union, by the defendant, has been extensively considered and passed on in State v. Lewis, alias Collins, 181 Mo. 235.    (3)    It was entirely competent for the court to introduce the affidavit of Esther Rudolph for the purpose of impeaching her testimony, given at the trial, and this is true even though she stated at this trial that the facts stated in the affidavit were false. It then became a question for the jury as to whether she swore falsely when she made the affidavit, or whether she swore falsely at the trial. She was an unwilling witness, and counsel did not abuse the privilege of cross-examination. It was with great difficulty that she was induced to respond at all, and only did so after frequent solicitations and urging by both counsel and the trial judge.    (4)    No error was committed by the court in refusing to make an order to remove the shackles from the hands of witness George Collins. The sheriff made oath to the fact that Collins was convicted of murder; that by reputation he was a dangerous and untrustworthy person; that he was sentenced to be hanged on the day succeeding the day on which he testified, and that the sheriff had good reason to believe, and did believe, that if brought into court unshackled, he would attempt to es-

cape. On such showing the court would have been warranted in refusing to remove the shackles from the defendant himself. The court has the inherent power to take all necessary steps to have a quiet and orderly trial, even to the binding of the prisoner with fetters, and if such precaution may be taken with a defendant on trial, why may not like means be taken with one of his witnesses? No reason exists for a different rule. State v. Kring, 64 Mo. 591; State v. Duncan, 116 Mo. 308; 1 Bish. New Crim. Proc., sec. 952a. The court did not err in permitting a number of guards to attend the defendant during trial. State v. Duncan, supra; 1 Bish. Crim. Proc., supra. (5) The official character of the deceased, and his right to make an arrest, does not arise in this case. The case was tried upon the theory that no attempt to arrest the defendant was made, and in fact no such attempt was made. It is true that the deceased did not announce his official character, or the purpose of his visit; but it is also true that he had no opportunity to do so. There was ample evidence, however, to justify the assumption that the defendant did know the purpose of the visit of the posse. If the testimony offered on behalf of the State, as to what occurred, is true, the killing of Schumacher was wholly inexcusable. The evidence shows that the defendant was not wholly surprised at the visit of the posse, and that he had prepared himself to escape at all hazards. There was no apparent necessity, according to the State's witnesses, for the homicidal act, and no excuse therefor. This is not a case where one slays an officer in resisting arrest. It is a case where one slays an officer whom he assumes is about to arrest him. State v. Underwood, 75 Mo. 238; Snell v. State, 87 Ga. 50; State v. Craft, 164 Mo. 631; Talbot v. State, 71 Miss. 189; State v. Mowery, 37 Kan. 377. The instructions given in this case are copies of those given in the case of State v. Lewis, alias Collins, 181 Mo. 235.

FOX, J.—"On the sixteenth day of February, 1904, there was filed in the office of the clerk of the circuit court of Franklin county, Missouri, the affidavit of O. L. Vedder, charging the defendant, William Rudolph, alias William Anderson, with having murdered Charles J. Schumacher on the twenty-fourth day of January, 1903. Afterwards, and on the same day, the prosecuting attorney filed his information, based on said affidavit, formally charging. the defendant with murder."

Appellant, by motion to quash duly filed, challenged the validity of the information, which motion was by the court overruled. There is no necessity for reproducing here that motion; it will be given proper attention during the course of the opinion. Defendant was duly arraigned and the trial proceeded. Upon the trial the testimony on the part of the State tended to establish the following state of facts:

"That on the night of December 26, 1902, the Bank of Union, at Union, Missouri, was burglarized by two men, and a large amount of money and other property was stolen. It afterwards developed that the parties who burglarized the bank were the defendant and Fred Lewis, alias Fred Collins. Collins has been tried, found guilty of murder in the first degree, and hanged in accordance with the judgment of this and the trial court, for the murder of Charles J. Schumacher.

"The burglary was committed by the use of nitroglycerine, with which the robbers blew open the vault and safe. These men were observed in the act of burglarizing and robbing the bank; but they escaped with their booty, which consisted of a large amount of gold, silver and paper money, in the sum of about fourteen thousand dollars, together with eighty or ninety thousand dollars worth of bonds and bills receivable.

"The deceased, at the time of the burglary of the bank, was in the employ of the Pinkerton Detective

Agency, and was detailed to discover and apprehend the persons connected with the burglary of the bank. Accordingly he was sent to Franklin county to make such investigations as he deemed expedient. In making these investigations, he traveled over the greater portion of Franklin county, and reached Staunton on the twenty-first or twenty-second of January, and there discovered that the defendant, who had been from his home, which was situate near Staunton, for about four years, had recently returned and had brought with him another man known in the neighborhood as Collins, but whose real name was Fred Lewis.

"The deceased's suspicions were leveled against these men and acting upon his suspicions, and from the circumstances and information obtained, he, in company with a young man of the neighborhood, left Staunton on the morning of the twenty-second of January, two days before the killing, ostensibly for the purpose of hunting rabbits, but in reality to make further investigation as to the truth of his suspicions that the defendant and Collins had burglarized the bank. During the course of the day, they reached the premises of Frank Rudolph, who is the stepfather of the defendant, and where the defendant was then staying. The deceased and his comrade knocked at the door of the Rudolph home, and asked for a drink of water. The door was opened just wide enough to permit one of Rudolph's sisters to hand out a cup of water. The water was drunk and then deceased stated that he and his companion had been hunting, were hungry and asked if they could obtain dinner. Rudolph's sister retired from the doorway, when defendant came up and inquired what it was that the deceased wished. He was advised, and thereupon he said, 'Hand me your guns, gentlemen.' The guns were handed to the defendant and by him placed in a corner of the room, while deceased and his companion ate dinner.

"The meal finished, the deceased and his associate

departed. When they returned to Staunton, the deceased applied to a justice of the peace for a search warrant, in order that he might search the Rudolph home, and also a warrant for the arrest of William Rudolph. The warrants were obtained. At about the same time he requested the sheriff of the county to come to Staunton and assist in making the arrest. The sheriff sent his deputy, Louis Vedder, to Staunton to assist; but before leaving Union, Vedder obtained a warrant for the arrest of Rudolph upon the charge of burglary, after which he organized a posse of men at Staunton, composed of the deceased, Emanuel Cromer and B. F. Tichenor, which posse accompanied the deputy sheriff to the Rudolph home, which was located about four miles northwest of Staunton. The Rudolph house is about sixty feet long, forty feet wide, two stories high, with four doors on the west side, faces west, is situate on a slight elevation which slopes westward. It is located near the edge of a clearing, on which trees were standing at various places.

"The deceased, together with the posse, approached the Rudolph home from the west side. The Rudolph family, at this time, consisted of Frank Rudolph, stepfather to the defendant, Nancy Rudolph, defendant's mother, and defendant's two sisters. These persons, together with Collins and one Harmes, an uncle of the defendant, were in the house at the time of the approach of the posse. One of the defendant's sisters, from a window of the house, observed the posse approaching. She advised the defendant of the observation, and the evidence on behalf of the State shows that defendant and Collins sprang to their feet, looked out of the window, and the defendant said: 'It is them.' Whereupon Collins inquired, 'What shall we do?' and the defendant said: 'We will shoot our way out.'

"The evidence further shows that the deceased, the deputy sheriff and two other parties accompanying them, approached the house in the ordinary manner.

Tichenor had been told to go to the northwest corner of the house, in order to prevent escape from that quarter. The other three men, Schumacher, Cromer and Vedder, went to the second door and knocked. As soon as they knocked they heard some one running about in the house and they knocked again. The door at which they knocked was not opened; but the defendant and Collins came rushing out of another door of the house with weapons in their hands, the defendant having a Winchester and a pistol and Collins a pistol in each hand. As soon as defendant and Collins emerged from the house, they commanded the parties outside to throw up their hands. The deceased and Cromer complied with the command; and defendant and Collins began firing their weapons at once. The deceased made no effort to fire his gun, and held the same in one of his uplifted hands and while in this position he received several wounds in his body, one of these striking him in the head.

"After the deceased had fallen, the defendant took his gun and cartridges. The body of the deceased remained where it fell from ten o'clock in the morning until five in the afternoon, when a number of persons in company with the sheriff went to the premises and removed it to the undertaker's establishment.

"Defendant and Collins immediately went to a neighbor's, where they purchased some horses and rode away. Soon thereafter they met two men by the name of Nehsiser and Meyersieck, who had been advised of the killing and who were seeking to apprehend the defendant and Collins. The defendants ordered these to throw up their hands. Several shots were exchanged; but the defendant and Collins escaped. Sometime thereafter they were arrested at Hartford, Connecticut. Large sums of money were found in their possession at Hartford, which money was identified by the officers of the Bank of Union, as being the money taken from the vault on the night the bank was burglarized.

A part of the money belonging to the bank was also discovered in the well at the Rudolph home, which money was discovered in the well by reason of the fact of a declaration to that effect made by the defendant.

"The defendant was lodged in jail in the city of St. Louis for safekeeping, in March, 1903; but afterwards, in July, 1903, he escaped therefrom and was afterwards apprehended in the State of Kansas."

On the other hand, the testimony of the defendant tended to show the following state of facts:

"His testimony is substantially the same as the State's up to the time the four men, Cromer, Tichenor, Vedder and Schumacher reached the Rudolph house and then the facts as told by defendant's witnesses are as follows: Esther Rudolph saw the four men approaching the house with guns in their hands. The four men came up to the house, two came to the second door from the north end on the west side of the house, and the other two went to the north door on the same side and began knocking simultaneously, in a loud and violent manner on both doors, and then began kicking on the door; and without making any announcement of their purpose or that they were officers of the law, began shooting on the outside. The defendant and Collins up to this time had made no effort to do any violence, but when the shooting began on the outside, Rudolph, the defendant, told his mother to take the two girls and go down into the cellar. Then he and Collins went from the room where they had been sitting, into the bedroom, armed themselves, went through a vacant room and stepped out of the south door on the west side, covered the men with their revolvers and ordered them to 'Hold up,' and demanded the purpose of their coming. Three of the men held up their hands, Schumacher holding a double-barreled shotgun in his hand. Tichenor, being nearest the corner of the house, ran toward the corner, and when partially sheltered by the house, turned and fired, the shot

striking Collins in the left temple; at the same instant Schumacher threw his gun downward and fired at Rudolph who was about thirty feet away. Rudolph dropped to his knees as Schumacher fired, allowing the shot to pass over his head. Then the battle was on, and both Collins and Rudolph fired as fast as they could, until their revolvers were empty, and Tichenor fired two more shots and ran, Vedder fired two or three shots and ran away, Schumacher fell, shot in a number of places, and Cromer stood with his hands up until the firing was all over. Rudolph and Collins went into the house where Collins bound up the wound in his head and then they left the house.''

At the close of all the testimony, the defendant requested the court to give a peremptory instruction, directing the jury to acquit the defendant, and also tendered one for murder of the second degree, both of which were refused by the court. The court then proceeded to declare the law in the case, which declarations are substantially the same as those given in State v. Lewis, alias Collins, 181 Mo. 235. Hence, there is no necessity for reproducing them here.

The cause was submitted to the jury upon the evidence introduced and instructions of the court, and they returned a verdict of guilty of murder in the first degree, as charged in the information.

Motions for new trial and in arrest of judgment were filed and by the court overruled, and the defendant in due time and form prosecuted his appeal from the judgment of the verdict, and the record is now before us for consideration.

### OPINION.

The record in this cause presents a number of propositions for our consideration. They are briefly stated in the assignment of errors by learned counsel for appellant, as follows:

"1. The information should have been quashed because the constitutional amendment giving the prosecuting attorney power to issue informations in felony cases, is in conflict with the Constitution and treaties of the United States.

"2. The trial court made improper remarks in the presence and hearing of the jury to defendant's prejudice.

"3. Incompetent and irrelevant evidence was admitted to defendant's prejudice.

"4. The verdict is the result of prejudice.

"5. It was error to overrule defendant's motion to order handcuffs removed from defendant's witness, Collins, while testifying.

"6. It was error to overrule defendant's motion to have all the guards, except what were necessary to wait on the defendant, removed from the presence and sight of the jury.

"7. Erroneous instructions were given and proper instructions refused.

"8. The court failed to instruct the jury upon all the law applicable to the case."

The complaints of error in behalf of appellant will be given attention in the order in which they are presented in the briefs by the learned counsel.

The information in this cause is assailed on the ground that a prosecution of an offense of the character charged, upon information of the prosecuting attorney, is in contravention of the treaty of cession between the United States and France, by which the Louisiana Territory was ceded to the United States.

The third article of that treaty which was ratified in April, 1803, so far as it is applicable to the proposition now being discussed, provides that: "The inhabitants of the ceded territory shall be incorporated in the Union of the United States and admitted as soon as possible according to the principles of the Federal Constitution, to the enjoyment of all the rights, ad-

vantages and immunities of citizens of the United States.''

The fifth amendment to the Constitution of the United States, provides that ''no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, . . . nor be deprived of life, liberty or property without due process of law.'' Upon these provisions, the argument is predicated that the defendant in this cause is deprived at least of some of his rights, advantages and immunities, guaranteed to him by the treaty of April, 1803, between the United States and France. It is insisted that the fifth amendment to the Constitution of the United States was one of the essential principles of the Federal Constitution, and that the prosecution of this (a capital offense) upon information, as provided by the amendment to section 12 of article 2 of the Constitution of Missouri, is in violation of the fifth amendment of the Federal Constitution, as well as the spirit of the treaty herein mentioned.

The fundamental error assumed in the contention of appellant, is in the application of the provisions of the fifth amendment of the Federal Constitution to criminal procedure under the Constitution of this State. The fifth amendment of the Constitution of the United States, relating to criminal prosecutions, was not designed to limit the State government in its mode of procedure in such cases; but was exclusively designed as a restriction upon the Federal power. Mr. Justice MARSHALL, in the early history of our Republic, in his usually clear judicial expressions, interpreted the provisions of the Federal Constitution and clearly pointed out the powers to whom the terms of restriction in the Constitution were applicable. He thus met the proposition:

''The question presented is, we think, of great importance, but not of much difficulty. The Constitution

was ordained and established by the people of the
United States for themselves, for their own govern-
ment, and not for the government of the individual
States.    Each State established a Constitution for
itself, and, in that Constitution, provided such limita-
tions and restrictions on the powers of its particular
government as its judgment dictated.    The people of
the United States framed such a government for the
United States as they supposed best adapted to their
situation, and best calculated to promote their inter-
ests.    The powers they conferred on this government
were to be exercised by itself; and the limitations on
power, if expressed in general terms, are naturally,
and, we think, necessarily applicable to the government
created by the instrument.    They are limitations of
power granted in the instrument itself; not of distinct
governments framed by different persons and for dif-
ferent purposes.''    [Barron v. City of Baltimore, 7
Peters 243.]

The interpretation by Mr. Justice MARSHALL and
his clear announcement of the doctrine, that the terms
of limitation in the Constitution were simply restric-
tions thrown around the exercise of Federal powers,
and not applicable to the exercise of powers under State
government, have never been departed from.

This court, in the recent case of State v. Jones,
168 Mo. l. c. 402, speaking through GANTT, J., said:
''The fourth, fifth and sixth amendments to the Con-
stitution of the United States are limitations only upon
Congressional power, and not upon the several States,
and it has been expressly held by the Supreme Court
of the United States, that a State Constitution author-
izing prosecutions for felonies on information rather
than by indictment was not a denial of due process of
law within the meaning of the fourteenth amendment
to the Constitution of the United States.''

It is equally well settled that the authority under
the provisions of the Constitution of this State to pros-

ecute felonies upon information, is not a denial of due process of law, within the meaning of the fourteenth amendment of the Constitution of the United States. In State v. Jones, supra, after a thorough and careful review of all the authorities, the conclusion was reached, and thus forcibly expressed: "That it was entirely competent for the people of Missouri to provide that felonies might be prosecuted by information without infringing the Constitution, we entertain no doubt whatever." This conclusion finds full support in Hurtado v. California, 110 U. S. 516; Hodgson v. Vermont, 168 U. S. 262.

The defendant in this cause has not been deprived of any of the rights, advantages or immunities guaranteed to citizens of the United States. The mode of procedure, which is authorized by the Constitution of this State, has been applied to him in the same manner as it is to other citizens who are prosecuted for similar offenses.

It is insisted that improper remarks were indulged in by the court during the progress of the trial. It is sufficient to say upon this contention, that we have read in detail the disclosures of the record as to the error complained of, in this respect, and while the court may have unhappily expressed itself in some of its rulings, the remarks complained of fall far short of such conduct as would warrant the reversal of this judgment upon that ground. The remarks were nothing more than those that commonly arise in the progress of a long and hotly contested trial. There was nothing said by the court which could be applied to the defendant, or in any way calculated to prejudice the jury against him, or endanger a fair and impartial trial.

It is next insisted that the trial court committed error in the admission of incompetent evidence. This complaint of error is directed to the introduction of the warrant issued by a justice of the peace for the ap-

prehension of the defendant for the offense of burglary, charged to have been committed in the dwelling of J. A. Swartz some three or four years prior to the charge upon which he was put on trial. This testimony, doubtless, was admitted for the purpose of explaining the presence of the deceased and those accompanying him, upon the Rudolph premises. There was no error in the admission of this testimony; it was certainly competent for the State to show, in this case, that the deceased was not upon the Rudolph premises for an unlawful purpose; especially was it of great importance to establish this fact, in view of the plea of self-defense interposed by the defendant. There was no offer to establish his guilt of the offense for which the warrant was issued; but merely the warrant, showing authority to view the premises where the defendant was staying. The admission of this testimony does not fall within that class of cases cited by learned counsel for appellant, in which this court correctly condemns the introduction of evidence establishing the commission of offenses which are separate and distinct and have no connection with the charge on trial. That is not this case. The State should not be deprived of this testimony, which tends to establish that the deceased was in the peace of the State, simply because the evidence may be calculated to arouse a mere suspicion that the defendant may have committed other offenses.

As to the admission of the testimony of the burglary of the bank at Union by defendant and his accomplice Collins, we will say that, while that offense is separate and distinct from the one charged, yet it is so closely connected with the history of the crime charged, it is difficult to see how this case could be tried without its introduction. The proof of the guilt of the defendant of the bank robbery, under the circumstances surrounding this case, bears a close relation to this tragedy; the consciousness of guilt by the defendant of that offense is quite important, as explanatory of

his desperation manifested by his conduct at the time of the killing, as detailed by some of the witnesses in this cause.

It is unnecessary to pursue this subject further. It was before this court in State v. Lewis, alias Collins, supra. BURGESS, J., in discussing the admissibility of this testimony, fully answers the objection urged by appellant, and we fully approve the conclusion reached on that proposition. He thus announced the views of this court:

"There is no question but that, as a general rule, testimony which tends to show that the defendant upon trial has been guilty of another and different offense from that for which he is being tried is not permissible. But where it becomes necessary to show a motive for the crime for which the defendant is upon trial, then a different rule applies, and testimony concerning another crime recently theretofore committed, and there exists a proper connection between the two offenses, then testimony with respect to the first crime is permissible for that purpose. The homicide was not committed until about four weeks after the bank was burglarized, and was therefore no evidence that the killing was committed in the commission of the burglary. But that fact would not render the testimony inadmissible if for any reason it was competent. In fact, this evidence constituted in part the history of the transaction. Defendant knew at the time of the killing that about a month before he had participated in the robbery of the bank, and strenuous efforts were being made to discover who did it, with the purpose of apprehending and punishing the offenders, to prevent which he and his accomplice, Rudolph, were on the alert, and evidently well prepared to resist whoever might attempt it, and observing Schumacher and the deputy sheriff approaching the house in which they were, and in anticipation of their purpose, Rudolph ordered his mother and two sisters who were then in the house to go to the base-

ment, and just as they had done so, three of the four men, viz., Vedder, Cromer and Schumacher, went to one of the doors leading into the house; whereupon defendant and Rudolph went out of the house with weapons in their hands and ordered the men to throw up their hands, which they did, but, notwithstanding their action in obedience to the command, they shot and immediately killed Schumacher. They then fled the country and in about a month thereafter were apprehended in Hartford, Connecticut, at the time having upon their persons several large revolvers, among them one they had taken from Cromer at the time of the murder. Large sums of money were also found upon their persons, which was afterwards identified by the officers of the Bank of Union as being the money taken from the vault at the time the bank was burglarized. It thus appears that the sequel to the burglary of the bank was the murder of Schumacher, and that the motive in so doing was to prevent arrest and punishment for the crime.

"In McConkey v. Commonwealth, 101 Pa. St. 416, it was held that, if a murder is committed in an attempt to conceal stolen goods, evidence may be introduced at the trial, tending to connect the murder with the robbery, in order to prove the motive and object of the crime, and as part of the history of the occurrence.

"So, in the case of State v. Wintzingerode, 9 Ore. 153, it was held that evidence, if relevant to the issue in a criminal action, is not rendered inadmissible for the reason that it tends to prove the defendant guilty of a collateral offense.

"In the case of People v. Molineux, 168 N. Y. 264, it is held that proof of another crime than that for which a defendant is upon trial is competent to prove the specific crime charged only when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to

each other that proof of the one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. [State v. Spray, 174 Mo. 569.]

"Whenever proof of motive is an essential ingredient of the evidence against the defendant in a criminal trial, the motive to be established is the one which induced the commission of the crime charged in the indictment. Our conclusion is that the evidence was clearly admissible for the purpose of proving a motive for the killing and the identity of the defendant."

There was no error in the admission of the affidavit of Esther Rudolph. It was admitted for one purpose only, that of impeachment of the witness. She testified in behalf of the defendant, and when, upon cross-examination, her attention was called to this affidavit she admitted that the statements in the affidavit were false. The examination on cross-examination of this witness plainly brought to the attention of the jury this affidavit and the full contents of it, and even though it was unnecessary to read it to the jury, yet that did not place the witness in any worse position before the jury than the oral testimony which developed the contents of it. The court fully advised the jury that this affidavit was only to be considered in determining the credibility of the witness, hence we repeat there was no error in the admission of it.

Counsel complain that the court erred in refusing to remove the shackles from witness Collins while testifying in behalf of defendant. The record discloses that the sheriff filed an affidavit in which it is stated that the witness had been convicted of murder in the first degree, that he was a dangerous and untrustworthy person, that he was sentenced to be hanged, and that affiant had good reason to believe that if witness was brought into court unshackled, he would attempt to escape. It further appears that the shackles were sufficiently removed to enable the witness to use one of his

hands in making a plat of the premises where the tragedy occurred. There was no error in the action of the court in refusing to remove the shackles from the witness. While it may be said that defendants and their witnesses during the progress of trial should be unshackled, yet it does not follow that it would be error to pursue a different course when based upon sufficient reasons. As was said by the learned and esteemed judge in the Kring case (64 Mo. l. c. 592), there is "no doubt of the power of the criminal court, at the commencement or during the progress of a trial, to make such orders as may be necessary to secure a safe and orderly one." The affidavit made by the sheriff who had the custody of the witness was, beyond dispute, sufficient reason for the action of the court in refusing to remove the shackles from the witness as requested by counsel for appellant. This witness was in the custody of the law, and the court had the right to direct how he should be kept. Of course the action of the court in respect to a witness for a defendant before it, may be subject for review, and if arbitrary, without being based upon sufficient reason, and it operates to the prejudice of the defendant, it would furnish grounds for the reversal of the judgment; but that is not this case. We have in this cause to deal with the complaint, not that the defendant was shackled, but that a witness, who, if the testimony is true, was a desparate character, was shackled, and added to this, the condition which demanded an unusual course is emphasized by the affidavit of the sheriff that unless the course was adopted which was pursued by the court in respect to the witness, he would attempt to escape. Hence, we repeat that the conditions surrounding this trial fully warranted the action of the court in refusing the request of counsel.

It is next urged that the court committed error in permitting an unnecessary number of armed guards to attend the defendant during the progress of the trial.

We have read in detail the disclosures of the record upon this question, and we are of the opinion that this contention is without merit. From the testimony in this case there was no impropriety in having a substantial guard attending the defendant. There is nothing in the record that the conduct of any of them was improper, or in any way had a tendency to prejudice the rights of the defendant. In State v. Duncan (116 Mo. l. c. 308), while it was held that the objection to the armed guard attending the defendant was not properly preserved, yet this court through SHERWOOD, J., very forcibly expressed itself upon this proposition. After stating that the bill of exceptions did not properly preserve the objection for review, it was said: "But, if it did, there was nothing improper in an armed guard keeping watch over a defendant charged with murder in the first degree, and who, if much of the testimony heretofore recited is true, is a desperate and dangerous character. Furthermore, it is competent for the court to direct in what manner a prisoner when in court shall be kept. A prisoner is in the custody of the law when he enters the court room for trial, and some courts during that period order even a bailed prisoner into the charge of the sheriff. [1 Bishop on Criminal Proceedings, sec. 952a.]"

This leads us to the consideration of the complaint that the court did not fully instruct the jury upon the law applicable to this case. This contention is specially directed at the failure of the court to instruct the jury upon the subject of defendant's knowledge of the official character of the deceased, and those who were with him at the time of the killing. It is fundamental that declarations of law, either in the trial of civil or criminal causes, must be predicated upon the facts developed in the case. The facts, as shown by the evidence in this cause, do not bring it within the rules announced by this court in numerous cases, where officers have been slain by defendants resisting arrest.

The testimony indicates clearly that the point was never reached where the deceased, or those with him, was required to indicate their official authority.   If the testimony of the State is true there was no opportunity to announce their official character.

It may be said that it was the intention of the posse to arrest the defendant; yet this mere intention, without announcing their official character, would not justify the defendant in killing the deceased.   There must be an opportunity to indicate the official character and a failure to do so, followed up by force to physically restrain the defendant, before the right of self-defense can be invoked.   We have carefully considered the testimony in this cause as disclosed by the record, and have reached the conclusion that the question of official character is not involved in this case.   If the testimony of the State is true, then the killing of Schumacher was murder of the first degree.   On the other hand, if the testimony of the defendant is true, he was entitled to go acquit.   The evidence in this case did not warrant an instruction as to the knowledge of the defendant of the official character of the deceased, or those accompanying him.   While the question of official character, other than as it may be explanatory of the presence of the deceased upon the Rudolph premises, is not involved, yet the entire testimony indicates clearly that the defendant assumed that the deceased and his companions were officers and about to arrest him for the bank robbery.   Hence, we have in this case, not the killing of an officer in resisting arrest, but the killing of an officer who it was assumed was about to arrest him.

The witnesses were before the jury, both for the State and defendant; all of the testimony was heard; the court by an appropriate instruction directed the jury that if the deceased and those accompanying him acted in the manner at the time the fatal shot was fired, as indicated by the witnesses for the defendant, then

State v. Rudolph.

they should acquit him. It was the special province of the jury to pass upon the facts, under the directions of the court.

This cause, so far as the instructions of the court are involved, presents practically the same questions as the Lewis case, and what was said in that case but emphasizes the correctness of the conclusions in the one before us. BURGESS, J., speaking for this court in the Lewis case, in discussing the law declared by the court, said:

"There was no evidence, fact or circumstance in evidence, which authorized an instruction for any other degree of homicide than that of murder in the first degree. The killing was done with malice and deliberation, and was clearly murder in the first degree. The instructions which were given covered every feature of the case, and there was therefore no error committed in refusing other instructions asked by defendant."

We have herein given expression to our views of this cause upon the record before us. There are no disclosures in this record which would warrant the conclusion that the verdict of the jury was the result of passion or prejudice. If there were unfavorable conditions surrounding this case, as there are frequently in causes of this character, those conditions were created by the defendant, about which he has no legal reason for complaint. He was tried by a court and jury in the county where his offense was committed. His counsel have left nothing undone to the interest of their client, which could be accomplished in the honorable practice of their profession, all of which is made manifest by the careful preservation in the record of every unfavorable ruling by the trial court, as well as in the able presentation of this cause in this court. Hence, whatever results may flow from the conduct in the life of this defendant, the responsibility for such results must rest with him.

Finding no error in the trial of this cause, the judg-

ment of the trial court will be affirmed, and we direct that the sentence pronounced against the said defendant be executed.

All concur except *Valliant*, J., who dissents for the reasons assigned in his dissenting opinion, and *Marshall*, J., absent.

### DISSENTING OPINION.

VALLIANT, J.—The majority opinion shows that the treaty with France has nothing to do with the law of this case and in that I fully concur.

I am, however, unable to concur in affirming the judgment of the circuit court, because, in my opinion, illegal testimony of a serious character, damaging to the defendant, was allowed to go to the jury over his objection.

The defendant was indicted for murder, and the question under the evidence on the trial was, was the killing murder, or was it excusable homicide? The testimony for the State on that vital question was in direct conflict with that for the defendant. In the majority opinion it is held that if the story told by the State's witnesses was true, the defendant was guilty of murder in the first degree, but that, on the other hand, if the story told by the defendant's witnesses was true, the defendant should have been acquitted. In such case, where the two stories are in irreconcilable conflict, it is for the jury to decide which is true—which set of witnesses will be credited and which discredited, and, in such case, it is of vital importance that illegal evidence which tends to throw no light on the real question on trial, but only to blacken the character of the defendant, or of his witnesses, should be excluded.

The defendant was on trial for murder, and he was entitled to be tried for that crime and no other. The fact that he may have committed burglary four years before, or bank robbery more recently, was not

a fact which the State was entitled to prove directly, or to infuse indirectly into the minds of the jury. Until a defendant himself brings his character into question, it is not involved in the inquiry—whether he be a good man or a bad man, he is entitled to be tried only for the offense charged in the indictment.

And whilst it is the law that a witness may be impeached by showing that he has made statements at a former time contradictory of the statements he makes at the trial, yet this. is only so of statements that are material to the issue.

On the trial of this case the State was permitted to prove, over the objection of defendant, that one of the men in the party of the deceased had in his possession a warrant to arrest the defendant on the charge of burglary, alleged to have been committed four years before, and that warrant was read in evidence.

I can see no legal excuse for the introduction of that evidence and it seems to me that it was very damaging in its character. It tended to show, not the circumstances under which the killing occurred, but that the defendant was, irrespective of this killing, a bad man.

It is said that the warrant was to show that this man and his party were on the defendant's premises for a lawful purpose. But how could that influence the conduct of the defendant when he knew nothing of the warrant, and how does it tend to prove that the act of killing occurred in the manner as told by the State's witnesses and not in the manner as told by the defendant's witnesses? The verdict should rest on the testimony of what occurred on the premises on the morning of the killing; the State's witnesses said it occurred thus, while the defendant's witnesses said it occurred so—now, how does that warrant in the pocket of one of the men tend to prove which set of witnesses told the truth? Then why was it introduced in evidence unless to show the jury that, irrespective of the charge

in the indictment, this was a bad man, of whom the State could well be rid?

The learned counsel for defendant complains that the court in its instructions failed to present for the consideration of the jury the question of whether the defendant knew that these men came in the name of the law with legal warrant. He says they came disguised as hunters, bearing no insignia of office, and giving no intimation of their real purpose, but showing only the conduct of armed men with hostile design, making violent demonstrations with their guns. And he contends that the court ought to have instructed the jury that, under the conditions, it was the duty of the attacking party to announce to the defendant that they came with a warrant for his arrest in the name of the law, so that he might understand their warlike array and bow to the mandate of the law, if he was so inclined. There is force in that argument. Even though the man was a burglar and a bank robber, no one had the right to kill him on sight, and he had the right to defend himself against an armed foe of whose purpose he knew nothing, except what he could infer from the demonstration.

In the majority opinion it is held that it was unnecessary to instruct the jury on this point because it was not a question of resisting an officer in his effort to arrest under a warrant, but that the trial court fully covered the case when it instructed the jury in effect that if the killing occurred as the defendant's witnesses said it did, they must find him not guilty.

I am willing on that point to defer to the judgment of my learned associates. But if the question of killing an officer in resisting arrest under a lawful warrant was not in the case and, therefore, no instruction on that point was required, what excuse can be given for reading the warrant in evidence? If the defendant was not entitled to have the jury consider the fact that he did not know that the man had a warrant for his arrest,

what right did the State have to show that the man had the warrant?

I think it was also error, of even more injurious character, to admit in evidence the affidavit of the girl Esther Rudolph. That affidavit tended only to show that the defendant was guilty of bank robbery. Thus, while he was defending himself as best he could under the charge of murder, the State by the warrant and by the affidavit, laid upon his head the crime of burglary of date four year before, and that of bank robbery of more recent date. And not only that, but this affidavit was avowedly designed to impeach the credibility of one of the defendant's chief witnesses. There was nothing in the affidavit, as I understand it, that contradicted anything that this witness testified to material to the issue on trial. It was only on cross-examination by counsel for the State that she was asked questions designed to elicit evidence tending to show circumstances connecting the defendant with the bank robbery, and when her answers to those questions were denials of those circumstances, she was confronted with her affidavit, and then she said that the affidavit was not true. Whether the statements in the affidavit were true or false was immaterial, because they were statements irrelevant to the issue on trial. A witness can not be thus impeached on an immaterial issue.

Besides, even if the affidavit had tended to contradict the testimony of the witness on a material point, it ought not to have been admitted in evidence if it was obtained in the manner in which she said it was. This was a mere child, thirteen years old when she made the affidavit, and she testified on the stand that she had been arrested, put in jail and frightened into making it. She said that they told her that if she did not sign the affidavit they would hang her father. Under those circumstances, the trial court ought to have inquired very carefully into the circumstances of the making of the

affidavit before admitting it in evidence, even if it had been otherwise relevant and competent.

In my opinion the warrant and the affidavit were illegal, damaging evidence and because they were admitted over the objection of defendant, the judgment ought to be reversed and a new trial awarded.