# DE WOLF v. STATE.

No. A-11351.  May 28, 1952.

(245 P. 2d 107.)

George Campbell, Sand Springs, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Ass't Atty. Gen., for defendant in error.

BRETT, P. J. The plaintiff in error, Carl Austin DeWolf, defendant below, was charged in the district court of Tulsa county, Oklahoma, by information with the murder of Police Officer Gerald St. Clair on August 30, 1946, in Tulsa county, Oklahoma. The crime was allegedly committed in Tulsa county, Oklahoma, by means of a pistol shot. The defendant was brought to trial on September 28, 1949, tried by a jury, convicted, his punishment fixed at death, and judgment and sentence entered accordingly on September 30, 1949. From said judgment and sentence, this appeal has been perfected.

The delay as to a decision in this case has been incident to changes in personnel of counsel representing the defendant and in filing briefs by counsel for both the defendant and the state. The defendant's brief was filed herein on July 25, 1951, and the state's brief was filed herein on January 7, 1952. The court did not wish to consider this appeal until briefs were filed by both the state and the defendant. The record is long and one legal question presented is of first impression. We did not desire to consider it without adequate briefing. Then the character of the case required the fullest consideration.

Numerous errors are complained of in the trial below, which the defendant urges and which we will consider in the order in which they appear in the defendant's brief.

Before this case came on for trial, the defendant filed his motion to quash the jury panel for the reason, that J. S. Chamblee, as a certified jury commissioner, participated in the selection of the jury in this cause, at which time he was disqualified to serve as a jury commissioner. It is contended Chamblee had litigation pending in said court, same being cause No. 30393, wherein he was plaintiff and one J. T. Thompson was defendant, contrary to the provisions of Title 38, § 1, O. S. A. 1941, setting out the qualifications of a jury commissioner and reading in part as follows, to wit, "and who shall not be interested in any cause, civil or criminal, pending in any court of this State". The defendant overlooks the fact that this provision must be construed with § 13, Title 38, O. S. A. 1941, reading in part as follows, to wit:

"A substantial compliance with the provisions of this Chapter, shall be sufficient to prevent the setting aside of any verdict rendered by a jury chosen hereunder, unless the irregularity in drawing, and summoning or empaneling the same, resulted in depriving a party litigant of some substantial right."

The record herein does not disclose that the defendant was deprived of any substantial right. Moreover, so far as this defendant is concerned there was a substantial compliance with the provisions of the chapter herein involved, for the litigation of the commissioner bears no relation to the case at bar. Furthermore, so far as the trial of this case was concerned there was no material departure from the forms prescribed as to law. It nowhere appears in the record that the jury commissioner had any interest in the outcome of the trial of DeWolf. The rule is stated in 50 C. J. S., Juries, § 156, page 880, Note 34, and 35 C. J. page 260, Note 92, the fact that a "jury commissioner has an action pending which will be determined by a jury drawn from the list selected by him," will disqualify the commissioner from selecting jurors for that case, but "is not ground of challenge to the array". Turner v. State, 111 Tenn. 593, 69 S. W. 774, wherein it was held that such situation "does not vitiate the proceedings of the commissioners when the other members of the board are qualified." To the same effect is Walker v. State, 98 Tex. Cr. 663, 267 S. W. 988. This rule was followed in Viduarri v. Bruni (Tex. Civ. App.) 179 S. W. 2d 818, involving the

jury wheel and the sheriff's participation in the use thereof where he has a suit pending to try title.

No cases appear to have been decided in Oklahoma factually in point with the case at bar, but cases holding that the burden is on the defendant to show that the illegality or wrong, which is the basis of such challenge, is such as to have caused the defendant to suffer prejudice. Houston v. State, 63 Okla. Cr. 49, 72 P. 2d 526; Maddox v. State, 12 Okla. Cr. 462, 158 P. 883; Buxton v. State, 11 Okla. Cr. 85, 143 P. 58. Herein the proof of prejudice to the defendant on this point is totally lacking.

Second, the defendant contends the trial court erred in refusing the motion for continuance on the ground of the absence of one of this counsel, George Striplin, public defender, on account of illness. The defendant contends that George P. Striplin was the counsel duly representing him, and that Quinn M. Dickason had looked after only formal matters. He further contends Striplin had prepared said case for trial, and that Dickason, who was unfamiliar with the case, was compelled to go to trial, upon overruling of the defendant's motion for continuance. The gist of said motion was as follows, to wit, that the defendant was destitute of funds with which to prepare his defense. That his brother arrived from the east about a week before trial, conferred with Mr. Striplin and endeavored to locate the defendant's witnesses without success, and that a certain girl known to the defendant who was supposed to be present to testify for him to the effect the defendant was in Drumright, Oklahoma, in the early part of the evening, before the murder, and that the defendant was back in Drumright shortly after the murder was supposed to have been committed, could not be found by defendant's brother. That this young woman had gone to California, and defendant had not had time to procure her return, and was without funds or time in which to take her deposition. Further, that the defendant rode from Jennings, Oklahoma, on the afternoon of the murder to an address in West Tulsa or Sand Springs with a man whose name is unknown, and whose whereabouts he had been unable to ascertain because of lack of time and funds.

As to the first part of this motion the record discloses that Mr. Dickason represented the defendant in the preliminary proceedings, was appointed on July 27, 1949, by the trial court, (at time of arraignment) to represent the defendant, and that he has been one of the attorneys representing the defendant at every stage of this appeal. No proof was offered in support of said motion.

On the basis of such facts the trial court overruled the motion for continuance, which ruling the defendant contends was erroneous. The defendant contends the overruling of his motion was a denial of his constitutional right to have compulsory process for witnesses in his behalf, and contrary to his constitutional guarantees under the Bill of Rights.

In relation to the defendant's contention concerning Mr. Striplin's absence, the record shows that Mr. Dickason was at all times leading defense counsel. Furthermore the record shows that during most of the time both public defenders were present and participating in the trial. Under these conditions, it has been held, "an application for a continuance on the ground of the absence of leading counsel is properly denied, where the defendant is represented by his other counsel. Waldock v. State, 42 Okla. Cr. 331, 276 P. 509, 512. If such be the rule in relation to the absence of leading counsel, surely such should be the rule when leading counsel is present and participating at all times and associate counsel was also present a major portion of the time. Herein it appears Mr. Dickason was appointed leading counsel, in fact the only counsel to represent the defendant. Moreover as was said in Waldock v. State, supra, "the

defendant offered no testimony, and there is no showing that by reason of the denial of the court of his motion for continuance he was prevented from presenting a proper defense". On this ground the defendant has failed to make a proper showing. He was represented by able counsel who protected his rights at all stages of the proceedings. Hence the trial court's action in overruling the motion for continuance on this ground did not constitute an abuse of discretion.

On the proposition that the certain young lady known to the defendant could not be found, and that she had moved to California, and an unknown man both of whom it was alleged would substantiate the defendant's alibi as hereinbefore set forth, and concerning which the state waived statutory notice, the defendant's motion is entirely insufficient in that the exercise of due diligence to obtain the presence of the known witness (whose identity is not disclosed, and whose address is not indicated, but only that she is in the State of California). When due diligence to procure the attendance of a witness is not shown, it is not an abuse of discretion to overrule an application for continuance, on ground of the absence of a material witness, Simmons v. State, 68 Okla. Cr. 337, 98 P. 2d 623. Title 12, § 668, O. S. 1951, provides the conditions under which a continuance may be granted in case of an absent witness. The pertinent part of the aforesaid statute reads as follows:

"A motion for a continuance, on account of the absence of evidence, can be made only upon affidavit, showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it, and where the evidence may be; and if it is for an absent witness, the affidavit must show where the witness resides, if his residence is known to the party, and the probability of procuring his testimony within a reasonable time, and what facts he believes the witness will prove, and that he believes them to be true."

This statute applies to both criminal and civil cases. Rhea v. Territory, 3 Okla. Cr. 230, 105 P. 314; Lane v. State, 65 Okla. Cr. 192, 84 P. 2d 807. See also Robinson v. State, 87 Okla. Cr. 267, 197 P. 2d 517 and cases cited therein. This oral motion wholly fails to meet the conditions of the statute. First, it is unsworn to; second, it does not show due diligence in obtaining even the known unidentified witness (either by name or location); third, it does not show the probability of obtaining within a reasonable time the testimony of either of said witnesses, or that the defendant believed the matters he says these witnesses would testify to would be the truth. Hence the motion was entirely inadequate. Lane v. State, supra. Each such case must depend upon the facts of the particular case. The determination of a motion for continuance on ground of absent witnesses is a matter within the sound judicial discretion of the trial court. Keith v. State, 87 Okla. Cr. 310, 197 P. 2d 635. It is apparent that the defendant had from arraignment on July 27, 1949, to September 28, 1949, trial date, to make some effort to locate these witnesses. In this he did not exercise due diligence. Moreover his motion as hereinbefore stated makes little or no effort to comply with the provisions of the statute in regard to absent witnesses. He makes no attempt to identify them nor locate them. In fact this motion presents a lame effort at delay. It has been held in Wininger v. State, 55 Okla. Cr. 78, 24 P. 2d 664, as follows:

"A defendant who applies for a continuance on the ground of absent witnesses must exhaust all his legal remedies to obtain the presence of such witnesses, and this must affirmatively appear from the affidavit; otherwise it is bad on its face, and it is not an abuse of discretion for the court to overrule the application. Guest v. State, 46 Okla. Cr. 228, 287 P. 818; Wagner v. State, 46 Okla. Cr. 269, 285 P. 141."

In light of the rule therein announced the said motion is bad on its face. The contention that the defendant was denied his constitutional right to have compulsory process for witnesses is therefore without merit.

The third proposition urged by defendant is that the court erred in admitting improper evidence on the part of witness Rennie Hoover, former wife of defendant, over objection and exception. It appears from the record that the said Rennie Hoover was offered as a witness for the state in chief. This proposition will be considered under the testimony of Rennie Hoover, hereinafter.

The next proposition is one of more serious import, and which has apparently never been passed on by this court, that is, the fact that on motion before selection of the jury and after hearing, out of the presence of the jury, it was ordered by the court that the defendant be kept in the courtroom in leg irons during all the trial, except when he testified in his own behalf. The evidence in support of this procedure was in substance as follows: The record discloses that the F.B.I. criminal record of Carl Austin DeWolf dates from March 25, 1932, as a boy, for bicycle and candy theft, followed by several motor vehicle thefts, statutory rape in the State of Massachusetts, to armed robbery in California for which he received a life sentence, and escapes from the state prison of Massachusetts and attempted escapes from the county jail in Orange county, California, for which he was sentenced from 0 to 10 years to run concurrently with the life sentence. It appears the defendant told the Tulsa county authorities while being returned from California that, "if he thought he could get away without being shot, he would do it". Shortly after leaving the California state prison at Sacramento, the defendant produced a hand-made key he fashioned himself from a razor blade. This key, however, would only unlock Peerless handcuffs and not Harrington and Richardson cuffs, which the Tulsa sheriff used. A similar key had been taken from the defendant in the California prison, and he had been stripped and searched before leaving there. This evidence also was to the effect that the defendant related how he had intended to use the key, but undoubtedly seeing it was of no use, surrendered it. Officer Stege testified he believed the defendant would attempt to escape, if possible, and that he was dangerous.

Sheriff Blaine corroborated the foregoing, and in addition testified that the defendant sawed through two bars in his cell and escaped to the run-around. The sheriff said the defendant told him he accomplished the act by means of a hack saw he had secreted in his shoe in the Folsom Penitentiary of California. Moreover, the sheriff testified the defendant had fashioned a dagger from parts of the bathtub, and wire from a broom handle. The sheriff said it was his opinion this defendant was a dangerous man, and that he would likely attempt an escape if he were not shackled, and that such procedure was necessary. The county attorney suggested that the motion was not made by the state but by the sheriff.

Predicated upon the showing of defendant's predilection to escape, and to being a dangerous and violent person, and in keeping with orderly procedure, and safety of the court, jury and the general public, the trial court ordered the defendant to be tried in manacles. He was so kept in custody until he took the witness stand, when the manacles were removed.

The question raised by the foregoing state of the record is, Did the trial court err in permitting the sheriff to continue the defendant in irons during the trial proceedings, except when he was on the witness stand. Under the Constitutions of the State of Oklahoma, art. 2, § 7, and the United States Amend. 5 every person charged with crime "shall not be denied life, liberty or property without due process of law", and is entitled to a fair and impartial trial, as well

as, the right to be free to defend himself. Furthermore, our statutes on Criminal Procedure, Title 22, § 15, O. S. 1951, provides:

"No person can be compelled in a criminal action to be witness against himself; nor can a person charged with a public offense be subjected before conviction to any more restraint than is necessary for his detention to answer the charge."

Title 22, § 191, O. S. 1951, further provides:

"The defendant is not to be subjected to any more restraint than is necessary for his arrest and detention."

The foregoing statutes are but legislative expressions of the common-law rule, as modified by modern necessity. The common-law rule is to the effect that a prisoner brought into the presence of the court for trial upon a plea of not guilty was entitled to appear "free of all manner of shackles and bonds, unless there be evident danger of escape, and then he may be secured by irons", Blackstone, 4th Com. 332. State v. Williams, 18 Wash. 47, 50 P. 580, 581, 39 L. R. A. 821, 63 Am. St. Rep. 869, 871, as follows:

"It was the ancient rule at common law that a prisoner brought into the presence of the court for trial upon a plea of not guilty to an indictment was entitled to appear free of all manner of shackles or bonds; and, prior to 1722, when a prisoner was arraigned or appeared at the bar of the court to plead, he was presented without manacles or bonds, unless there was evident danger of his escape. 2 Hale, Pl.C. 219; 4 Bl.Comm. 322; Layer's Case, 6 State Trials (4th Ed., by Hargrave) 230, 231, 244, 245; Waite's Case, 1 Leach, 36. In J. Kelyng's Reports (pleas of the crown adjudged in the reign of Charles II), 'it was resolved that, when prisoners come to the bar to be tried, their irons ought to be taken off, in that they be not in any torture while they make their defense, be their crime never so great. * * *' "

The reason for the foregoing safeguards is further expressed therein, as follows:

" 'When the court allows a prisoner to be brought before a jury with his hands chained in irons, and refuses, on his application or that of his counsel, to order their removal, the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers. Besides, the condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties.' Section 22, art. 1, of our constitution, declares that: 'in criminal prosecutions the accused shall have the right to appear and defend in person.' The right here declared is to appear with the use of not only his mental but his physical faculties unfettered, and unless some impelling necessity demands the restraint of a prisoner, to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty."

The foregoing constitutional provision of the state of Washington is in substance our constitutional provision, Art. II, § 20 of the Bill of Rights, reading in part as follows, to wit:

"In all criminal prosecutions the accused shall have the right to a * * * trial by an impartial jury. * * * He shall have the right to be heard by himself and counsel."

To be heard in an atmosphere of prejudice, created by cuffs and leg irons in the absence of necessity, constitutes a denial of trial by an impartial jury. In cases of necessity, even the common-law rule was relaxed. The relaxation of the common law rule has been made more necessary in modern times, by the automobile and machine gun. But even in such an age, the ancient right of the

defendant, to be free from irons in the trial of a criminal case, should be preserved and perpetuated in keeping with the ends of justice, orderly procedure, security of the court, the public and the defendant. The only expression of this court on the subject is found in Bradbury v. State, 51 Okla. Cr. 56, 299 P. 510, wherein it was held:

"It is not reversible error for the sheriff to bring prisoners into the courtroom, through a side door, for trial, manacled; the precaution apparently being necessary and the manacles having been removed and the prisoners permitted to go to their seats behind their counsel without manacles and unaccompanied by the officers, and left unmanacled during the trial."

This case however only applies to the question of bringing the defendant into court from the jail and returning him from the court to the jail, and it is by no means authority for the keeping of the defendant in handcuffs or leg irons during the trial of the case. Other cases holding such methods may be employed to secure the defendant's custody to and from the jail to the courtroom are, Stockton v. State, 148 Tex. Cr. R. 360, 187 S. W. 2d 86; State v. Hanrahan, 49 S. D. 434, 437, 207 N. W. 224; Donehy & Prather v. Commonwealth, 170 Ky. 474, 186 S. W. 161, 164, 3 A. L. R. 1161, wherein it was said:

"The sheriff, while conducting prisoners to and from court, was their proper custodian, and was responsible for their delivery to the court and back to the jail. Such officers have all kinds of criminals to deal with; they have not only the most dangerous and desperate criminals charged with such crimes as would give them an incentive to take any desperate chance to escape, but they are also the custodians of the most harmless and inoffensive offenders whose nature and disposition is such, or the charge against whom is such, that little inducement is offered them to undertake to escape or to do harm to others. Under such circumstances it would be most unreasonable to say that a public official charged with the responsibility of delivering prisoners to the court and returning them to jail should not be given the right to exercise some discretion in handling their prisoners. It would be unfair to the officer to say that he must treat a desperate and dangerous criminal in the same way and give him the same opportunity to escape or to do injury to others as he would an inoffensive prisoner charged with a less serious offense. * * *

"We entertain no doubt that it is within the sound discretion of an officer in custody of criminals, taking into account the nature of the offense charged and the character and disposition of the offender, to place handcuffs on him when he is taken to the court from the jail for trial."

Shultz v. State, 131 Fla. 757, 179 So. 764, 765:

"Every person is presumed to be innocent of the commission of crime and that presumption follows them through every stage of the trial until they shall have been convicted. It is, therefore, highly improper to bring a person who has not been convicted of crime, clothed as a convict and bound in chains, into the presence of a venire or jury by whom he is to be tried for any criminal offense and, when such condition is shown by the record to have obtained, in many cases it might be sufficient ground for reversal."

For further cases on this point see, 23 C. J. S., Criminal Law, § 977, page 313, Note 79; also 16 C. J. 819, § 2075, Note 6, for additional cases.

The abundance of cases collected in the foregoing texts hold substantially that the sheriff's discretion in such matter extends only to his custody from and to the jail. Moreover, the cases hold that proper procédure requires that the handcuffs and irons should be removed from the defendant out of the presence of the jury, both in bringing the defendant into and taking him from court. The courts generally hold that the extent of restraint during trial of a defendant is to be governed by the character of the accused, his disposition toward being a violent and dangerous person, both to the court, the public and to the defendant

294

himself, as well as being governed by his record for escapes and the possibility of attempts to release him from custody, or prevent such misconduct as would obstruct the work of the court. 23 C. J. S., Criminal Law, § 977, page 313, and notes. The use of armed guards to prevent escape, acts of violence or disturbances where feasible should be resorted to instead of handcuffs and shackles. We are of the opinion that the accused should not even be attended by armed guards during trial except where it is shown the defendant is a desperate character, State v. Rudolph, 187 Mo. 67, 85 S. W. 584, and then only by the trial court, where in exercise of sound discretion it is deemed necessary to prevent the defendant's escape or his forcible release, Pierpont v. State, 49 Ohio App. 77, 195 N. E. 264; Hall v. State, 199 Ind. 592, 159 N. E. 420, then both manacles and shackles and guards are permissible, 23 C. J. S., Criminal Law, § 977, page 314, Note 83; Makley v. State, 49 Ohio App. 359, 197 N. E. 339; Pierpont v. State, supra. Both of the said cases involved trials of reputed members of the famous John Dillinger gang. It has been said that restraint by means of cuffing the defendant to an officer is permissible to prevent the defendant from doing violence to others, People v. Kimball, 5 Cal. 2d 608, 55 P. 2d 483; Marion v. Commonwealth, 269 Ky. 729. 108 S. W. 2d 721; Corey v. State, 126 Conn. 41, 9 A. 2d 283; Gray v. State, 99 Tex. Cr. R. 305, 268 S. W. 941, 269 S. W. 1056; 23 C. J. S., Criminal Law, § 977, page 313, Note 76; or where, the defendant may do injury to himself. Gray v. State, supra; State v. Hanrahan, supra; People v. Loomis, 27 Cal. App. 2d 236, 80 P. 2d 1012, 1013; or, to prevent misconduct designed to obstruct the work of the court. In People v. Loomis, supra, the defendant resorted to shouting in a loud voice and use of profane and obscene language, kicking the counsel table, throwing himself on the floor and otherwise conducting himself in an improper manner. The restraint used was by strapping the defendant to his wheel chair and by placing a towel over his mouth. All the cases hold that the matter of restraint by means of surveillance, shackles and leg irons and other means of maintaining order and preventing acts of violence and escape are matters within the sound judicial discretion of the trial court, Odell v. Hudspeth, 10 Cir., 189 F. 2d 300; 16 C. J. 819; 23 C. J. S., Criminal Law, § 977, page 313; 14 Am. Jur. 855; and the appellate court will not reverse the trial court's action except in a clear case of abuse of discretion, Pierpont v. State, supra; Blair v. Commonwealth, 171 Ky. 319, 188 S. W. 390; and the burden of proof is on the defendant to sustain the allegations of abuse of discretion, Odell v. Hudpeth, supra, and cases cited therein. A case very much in point with the case at bar both factually and legally is State v. McKay, 63 Nev. 118, 165 P. 2d 389, 406, 167 P. 2d 476. Therein the defendant had a record that bears marked similarity to that of the defendant herein. The trial judge's reasons for requiring the defendant to be handcuffed reads as follows, towit:

" 'At that time I knew that the defendant had previously been convicted of burglary, had served a term in the Utah penitentiary, had deserted from the armed forces of the United States, had been sentenced to twenty years' imprisonment, had escaped from a military guard house, had registered in Reno under an assumed name, and had attempted to escape from the Washoe County jail. I had also been advised that while in the Washoe County jail the defendant had attempted to procure some hack saws in order to escape therefrom, at the time stating, in effect, that he could not secure his liberty legally. I had also been advised that the Sheriff and his deputies actually believed it necessary to keep the defendant handcuffed in Court in order to prevent his attempting to escape.' "

(The death penalty was imposed in this case.)

Therein the Supreme Court of Nevada after an exhaustive analysis of the authorities and applying them to the facts found that the restraint of the de-

fendant McKay was within the exercise of sound judicial discretion. In McKay v. Nevada, 1946, 329 U. S. 749, 67 S. Ct. 76, 91 L. Ed. 646, the United States Supreme Court denied McKay's petition for writ of certiorari. Sound judicial discretion it has been held is that "discretion * * * based upon reasonable grounds for apprehension", Marion v. Commonwealth, 269 Ky. 729, 108 S. W. 2d 721, 723; and the source of knowledge in each case is not limited to trial evidence. Hall v. State, supra; Makley v. State, supra; Pierpont v. State, supra. In view of the foregoing evidence, analysis and authorities hereinbefore set forth, we are of the opinion that the court's action in permitting the sheriff to keep shackles on the defendant during the trial of this case was not an abuse of discretion. We must observe, in conclusion, that each case must depend on its own facts, and this court will scrutinize with the greatest care every such case in search of abuse of discretion. It appears that the trial court's conclusions in this regard were well founded.

Next, the defendant complains that the trial court erred in refusing to permit the impeachment of one D. R. Shuck, witness for the state. The witness was asked on cross-examination if he had ever identified the picture of one Victor Floyd Everhart as being the man who hi-jacked him in his grocery store, to which the witness' answer was "No sir". J. D. Bills was offered as a rebuttal witness for impeachment of Shuck. Bills was asked if on or about August 30, 1946, D. R. Shuck had not identified the picture of Everhart in his presence, as the man who had hi-jacked him. No answer was made to the question. The trial court sustained the state's objection to the question. The defendant made no proffer of proof as to what the answer would have been. The record does not support this contention. In order to reserve an available objection to the exclusion of evidence, a proper question must be asked, and, on objection thereto, an offer must be made at the time showing what testimony will be given if the witness is permitted to answer, as well as a statement disclosing the purpose and object of the testimony sought to be introduced Dobbs v. State, 39 Okla. Cr. 368, 265 P. 661; Young v. State, 48 Okla. Cr. 443, 292 P. 867; Robsion v. State, 53 Okla. Cr. 178, 9 P. 2d 54; Rowe v. State, 56 Okla. Cr. 64, 33 P. 2d 233. Here the record is silent as to whether the defendant's answer would have been positive or negative. Hence there is no way to determine whether the defendant might have been injured by the refusal of the trial court to permit the answer.

It is further contended that a juror exclaimed in an audible voice while the defendant was on the witness stand, "he's lying". The record does not disclose any such statement from a juror. On appeal, it is fundamental that only such matters as appear of record can be considered therein.

Finally, the only other contention of merit is that the arguments of counsel for the state were inflammatory and highly prejudicial. This contention, like the last two preceding complaints, is not supported by the record. No record of the arguments appearing in the record, we have no material basis for a consideration of this contention.

The essential facts for a determination of this appeal are as follows: On August 30, 1946, Robert Kingsley's black Pontiac automobile, license No. 2-27641, was stolen from in front of his place of business located at 123 East 2nd Street, Tulsa, Oklahoma, in the late afternoon of said day. He reported the theft to the police department and went home at 3404 East Fifth street. Shortly after 6:00 p.m., he went to the front porch to pick up his paper, and saw people running east. He saw a police car drive up, and he followed the crowd, and there parked up against a tree was his automobile with bullet holes in the back, the side window and one of the front windows had been shattered.

In the car, among other things, was a pistol holster, a bunch of keys, and a brief case, and some money.

The Kingsley automobile had been used in the perpetration of the robbery of Mr. Shuck's grocery store located at 1441 N. Yale in Tulsa, about 6:00 p.m., on August 30, 1946. The defendant was identified by Mr. Shuck as the perpetrator of the robbery and the driver of the black Pontiac car bearing the license number of the Kingsley car. The robber, Mr. Shuck said, carried a brief case, from under which he drew a gun and into which he put the money taken from Shuck's cash register. He then asked about Shuck's billfolds. He had two, from one of which the defendant, he said, took an old $2 bill, with the corner torn off. Shuck had torn the corner off and thrown the corner over his shoulder. When the defendant left, Shuck got the automobile license number and wrote it down on a piece of paper, and reported it to the police. Shuck positively identified the defendant, and said during the robbery he was dressed in a khaki shirt, and pants, and a dirty brown hat. He identified a $2 bill, with the corner torn off, which was picked up by a little boy and the police at the point where the Pontiac was abandoned, and the brief case, both as being like the bill taken and brief case used in the robbery. He also said articles of clothing exhibited him looked identically like those worn by the robber. The piece of paper containing the auto license number was also identified by him. In the interim, between the robbery and the trial three years later, he said he picked out the defendant's picture from numerous photographs handed him. He testified at no time did he ever identify the picture of a Victor Everhart as the robber.

Numerous police officers testified in relation to the chase that ensued when the Pontiac was spotted, and also in relation to the exchange of pistol shots with the driver of the Pontiac. Among them were Officers Stilwell and Headrick. Stilwell testified the defendant opened fire in the chase and that they returned the fire. He said another officer, Harding, tried to stop the defendant and the defendant fired on him, hitting him. The record shows he was wounded in the leg and hip. At the point where the Pontiac was abandoned, the driver thereof shot at Officer Headrick who was trying to get out of his police car, and escaped across Indianapolis street over a hedge and around the corner of a house. Stilwell said he fired a shot just as the person driving the Pontiac left the Pontiac and crossed the hedge and ran into the yard of the house around which he disappeared. The individual driving the car, he said, was about, 30 to 35 years of age and about five feet and 10 inches tall, dark complexion, and dressed in khaki shirt, and trousers and a brown hat. He was confronted with the hat, shirt and pants, Exhibits No. 4 and 5, and said they looked like the ones he had seen. He said defendant DeWolf looked like the man he saw on the occasion in question but he could not absolutely say. Officer Headrick's testimony was substantially the same as that of Stilwell's, except he was positive in his identification of the defendant as the man in the Pontiac car. He said, "he was shooting right square at me, when I saw him". At one time these officers got the front end of their car up about even with the driver of the Pontiac, the record shows. He said the driver of the Pontiac fired on him and Officer Stilwell, with a 45 pistol till he emptied it, and then opened up with another one.

Officer Harding was at home when he heard the police radio report of the stolen Pontiac, the license number of which he wrote down, got in his car proceeded to Harvard street and turned south, about a block and a half away, he saw the Pontiac coming north at about 70 miles an hour, he stopped and got out of his police car and tried to stop the Pontiac, but the driver stuck his pistol out of the car and fired on him. He exchanged shots with the driver

of the Pontiac and was struck in the thigh of the left leg. He said all he could see was the defendant's head and shoulders. The driver of the Pontiac, he said, was about 15 feet from him when he passed. He further testified the man had on a khaki shirt and dark hat. He positively identified the defendant as the man who was driving the Pontiac automobile and shot him.

Fred Lawrence, Jr., city detective, hearing the radio broadcast, located the abandoned Pontiac, searched it and found two empty pistol holsters, a brief case and other articles. About 15 feet from the car his attention being called to it by a little boy, he picked up a $2 bill with the corner torn off of it, which was identified at the trial by Mr. Shuck as looking like the one he had which was taken from him by the robber, who escaped in the black Pontiac, license No. 2-27641, belonging to Mr. Kingsley, and stolen by the robber.

Ray Jones, policeman, testified that he and Officer Lang, hearing the radio broadcast, went to the vicinity of First and Harvard and found Officer Harding had been shot. Here they found a 45 caliber fired shell the open end of which had been mashed as though run over by an automobile. This he turned over to Officer Stege.

Special Policeman L. E. Kidwell testified to hearing the radio broadcast, and likewise proceeding to the Shuck store, where he obtained a description of the stolen car and the robber. He heard over the radio that the stolen car was proceeding north on Harvard street and he went to the vicinity of Harvard and Admiral, that he observed the man in the stolen car two blocks south, fire at Officer Harding, hit him, and saw the officer fall back against his police car. Officer Kidwell blew his whistle at the robber as he came north being pursued by another police car he whistled at the hijacker, and was shot at twice by him, that he returned the fire. Later after the Pontiac was abandoned, he saw the driver escape through a hedge, went around the corner to head him off, and later saw him backing a Ford coupe car out of the driveway at 24 South Knoxville, driving south on Knoxville to 3rd Street. Kidwell followed the driver of the Ford, and met Officers Elmer Strotman and Gerald St. Clair, as they approached in the opposite direction. He signaled to them, and they turned around and joined in the chase. Officers Strotman and St. Clair passed Officer Kidwell and took over the lead in the pursuit of the robber. Finally, the chase eventually reached Fifth Place and Jamestown, when the man in the stolen Ford car cut to the curb, opened the left door, and fired over his left shoulder, and that was the shot that killed Officer Gerald St. Clair. The bullet hit him just over the right eye. Then the driver of the Ford pulled to the center and renewed his flight, eventually being lost in the traffic. Officer Kidwell identified the defendant DeWolf as the man who fired the shot that killed Officer St. Clair.

Mrs. Paul Erckenbrach, who lived at 24 Knoxville Street in Tulsa, together with her husband and two sons, testified that on August 30, 1946, about 6:30 p.m., that she saw the defendant in her back yard, coming from the west, armed with two pistols. Just before she saw him her attention was attracted by pistol shots, and falling leaves as a result thereof. Then the defendant appeared through the hedge, he came in sort of a crouch, with pistols drawn. She, her husband, and one of her sons saw the defendant. He was only about 10 feet from them, pausing as though he had snagged himself on the hedge, she said. He came right toward the house. He then got within 10 feet of the house, and seeing their Ford car on the driveway he made for it, got in, couldn't find the starter button, backed the car down the driveway to start it, then fled in the Ford car. Mrs. Erckenbrach positively identified the defendant as being the man who crossed the back yard, and stole their car.

Gayle L. Moreland, Mrs. Erckenbrach's son, testified in substance as did his mother, and in addition stated he left the keys in their blue Ford car. He also testified one of the pistols the defendant had was a 45 which he held in his left hand. He said the man kept one of the pistols pointing out the window of the car while he hunted the starter button. Moreland said he was standing in the back yard not more than 10 feet away from the defendant when he observed the things which he related. This witness' evidence is most convincing from the standpoint of identification. After the crime herein involved occurred on August 30, 1946, Moreland, while a soldier stationed in the State of Washington, was flown from his station in February 1947 to Santa Ana, California, where he viewed the defendant. He said he saw that man in Tulsa, the day of the crime, and that at that time he wore a khaki shirt and pants, and a dark brown hat. Moreland said that about 2 hours later he picked up his Ford car on the parking lot of Tulsa University. The Ford had three bullet holes in it and 2 flat tires. Moreland was certain the defendant was the same man who stole his blue Ford car on August 30, 1946, and whom he viewed in Santa Ana jail in February 1947.

Elmer Strotman, police officer of Tulsa, and companion of decedent Officer St. Clair, testified that they got the radio report of the Shuck grocery store robbery, and they set out to find the stolen Pontiac car (which of course they did not realize had already been abandoned.) They met Officer Kidwell who was in pursuit of the stolen Erckenbrach car as hereinbefore related. He testified to the chase, and that Gerry St. Clair was driving. He said both of them returned the defendant's fire and that in the exchange of shots St. Clair was shot through the windshield, the bullet entering the head just over the right eye; and St. Clair dying at about 8:45 on the morning of September 2nd 1946. He identified the defendant as the driver of the Ford car who fired the fatal shot. He was present when the doctor removed the 45 bullet from St. Clair's head. The bullet was given to him and he in turn gave it to Officer Stege. He only identified the defendant from a profile view which he got when passing him when they met him and Officer Kidwell in pursuit as hereinbefore related. Thereafter they were never closer to the defendant than 40 or 50 feet. The fatal shot was fired in the vicinity of the intersection of Jamestown and 5th Place, in Tulsa.

Mr. and Mrs. Lee Barnes, residents of Tulsa, testified they were parked on the Tulsa University parking lot, awaiting the commencement of a dance when a blue Ford coupe banged up against the parking rail. A man jumped out of the Ford with two pistols in his hands, ran into the commissary and disappeared. They both identified the defendant as being that man. They described his dress as being khaki clothes.

Betty Jennings, another Tulsan, employed by the Personal Finance Company, was a passenger on a Tulsa bus, on August 30, 1946, at about 6:30 p.m., in the near vicinity of Tulsa University, about a block from the Tulsa University parking lot, where a man ran across the street in front of the bus, after it had started. The driver stopped to pick him up. The passenger paid his fare and sat down on the lengthwise seat of the bus in front of her, she said. He was clad in a white T shirt and khaki trousers. He had on no hat. She said, she could see the handle of an automatic pistol sticking out one of his pockets and the imprint of what appeared to be another gun, in another pocket. She said that there was some money about to fall out of his pocket and it was called to his attention by another passenger and he pushed it back in his pocket. She said she got a good look at him, and she identified the defendant as being the man she saw on the bus on August 30, 1946.

R. T. Gosnell, was the driver of the bus boarded by the man pointed out by Miss Jennings. He testified the man was in a fast walk, when he first saw him, that he jumped in front of the bus and he almost hit him. He stopped, he said, and the man got on and paid his fare. He said he looked the man right in the eye and said, "Friend, I have seen men die from such things as that". The man, he testified, was dressed in khaki pants that looked like officers trousers and a white shirt. Mr. Gosnell said he sat down behind him and he observed him further in his rear view mirror. The man started a conversation in the form of an inquiry about the right of officers to search a man's home for liquor. Mr. Gosnell said the man had perspiration on his face and a hatband mark on his forehead. This man rode to the end of the line, where there was a 3 or 4 minutes lay-over, and then he started the return trip. Gosnell said as he turned west on Fifth Place there was a bunch of people in the alley. He stated he remarked somebody has had a big wreck dead ahead of us, and the defendant said, "you better let me off right here". He did not let him off until at the next stop at Fifth Place and New Haven. The man, he said, got off and went behind the bus, south on New Haven at a pretty fast walk. He said he knew the defendant was that man.

Mr. J. E. Estes, a city employee, testified that he and Mr. Strader about 5:30 or 6:00 a.m., on August 31st went to the vicinity of Tulsa University in quest of evidence in the St. Clair killing, and there found a khaki shirt and a brown hat stuffed under some shrubbery on the edge of the Tulsa University campus. This hat and shirt were identified by witnesses who saw the defendant as looking like the shirt and hat he wore up to the time he was last seen entering the commissary at Tulsa University.

Dr. H. D. Murdock examined the decedent St. Clair and said that the bullet wound, with the bullet lodged in the brain in the back of the skull, was the cause of death, as did Dr. Emil Palik, who performed the autopsy. Dr. Palik gave the 45 bullet to Officer Strotman. This bullet was traced into the hands of the F. B. I and its laboratory for ballistic examination.

Hubert G. Wolff of San Diego, California, testified he parked his automobile on August 14, 1946, on Fifth street, near the Wells Hotel in Tulsa. On August 15 about 3:00 a.m., he looked out the window and saw his car was gone. He reported the theft to the police. Later he found it about 2 blocks down the street away from the hotel. All the valuables in the car were stolen. These valuables included a green army locker with his name and army serial number thereon, army uniform, a dark brown smooth leather brief case, a slide rule with his name in gold on the case, a Japanese flag and sword, a 22 Colts pistol, No. S. M. 615, and a 45 Colts pistol C #197335. The latter pistol was the death gun, in the case at bar. This 45 Colts pistol was recovered by Captain Mc-Graff in the sheriff's office in Santa Ana, California, from among the defendant's effects, incident to a lawful arrest. Mr. Wolff also testified that a box of 50 shells for the 45 was stolen from his car. He identified the pistol by serial number and the stolen articles as they were presented to him, all as being his property.

Rennie Allen Hoover, Mannford, Oklahoma, was the next witness, and the former wife of the defendant. She testified she met the defendant in Vincennes, Indiana on June 29, 1946, as a hitchhiker. He gave her a ride to her home in Mannford, Oklahoma, She related having been married on October 6, 1946, and divorced on July 1, 1948. She knew the defendant as Fred Van Sandt when she first met him. She did not know his true name was DeWolf until on July 6, 1946 when they went to California. First they were at Merced and then Chowchilla, California, and later other places. In addition, she testified that on

August 19 was the first time she saw a green army foot locker in Chowchilla, California, bearing the name of Mr. Wolff, in the possession of the defendant. It continued in his possession from that date until it was left at her mother's house, on October 6, 1946, when they were on their way back to Springfield, Massachusetts. She said it contained a Japanese flag and a sword, among other things, including a slide rule. The defendant told her then the trunk and contents belonged to his brother who had been killed in the Pacific. She stated the defendant gave her younger brother the slide rule, identified by Mr. Wolff as being his which was stolen from his car on August 14, 1946. This occurred at her mother's home in Rennie's presence. She identified the rule as the same one she saw in the trunk in California. She also identified the brief case which Mr. Wolff testified belonged to him and was stolen from his car on August 14, 1946, in Tulsa. Rennie Hoover said that the brief case was the one the defendant kept his four pistols in and that he had the brief case and the four pistols in his possession up to November 15, 1946, when she last saw it in Doheny Park, California. Sheriff P. E. Woodruff testified he found them in DeWolf's tourist apartment in the Graham Courts, in Riverside, California. Rennie said she did not see the defendant from July 6th to August 19, 1946. DeWolf testified he had gone to Rennie's mother's house looking for her. She also testified that about the 22nd of August, 1946, they left California and returned from Chowchilla, California, to Oklahoma, arriving about August 29, 1946. She testified that he let her off at Mannford at her mother's and she did not see him until August 30, 1946, in the morning. It was agreed that he would meet her that night and take her to an American Legion dance in Drumright, but he did not show up for it. The next day, August 31, 1946, she saw him about 9:00 a. m. She said she spent all day, August 31st, with the defendant. The defendant let Rennie out at Mannford and told her he was going to spend the night in Drumright at the Roberts Hotel. She next saw the defendant on September 1, and on September 2 they left for California. She said the defendant DeWolf had the green army foot locker with him in his car from August 18th or 19th until September 2, 1946. On October 6th, she said the locker was left at her mother's house in Mannford, Oklahoma. She said they returned to California about October 25, 1946. On cross-examination it was developed as hereinbefore related, she had been the defendant's wife. This showing having been made, the defendant then moved that all this evidence be stricken from the record, on the ground that Rennie Hoover was the defendant's wife and the evidence was inadmissible under the provisions of Title 22, § 702, O.S. 1951, in substance to the effect that neither husband nor wife is a competent witness against the other, except in a criminal prosecution by one against the other. In this connection it is well to note again that the trial in the case at bar commenced on September 28, 1949, more than 14 months after they were divorced on July 1, 1948. The question presented, is the effect of the divorce of the parties on the admissibility of the wife's testimony.

First, confidential or privileged communications are those, where persons occupy towards each other certain confidential relations, such as communications arising between husband and wife, 70 C. J. § 497 and § 508, in the confidence of the marital relation. But where the nature of the information sought is peculiarly within the knowledge of the spouse and is not acquired through the confidence of the marital relation, 70 C. J. § 512, or when the communication is in the presence or hearing of a third person, 70 C. J. § 525, such communication or knowledge is not within the rule of confidential or privileged communications. Second, the incompetency of a wife is removed by divorce as to privileged communications during the marriage. In Scott v. State, 59 Okla. Cr. 231, 57 P. 2d 639, 640, we said:

"In a prosecution for murder, the incompetency of the wife as a witness for the state depends upon the relationship at the time of the trial, and not as to whether she was the wife of the defendant at the time the crime is alleged to have been committed."

See, also, Kaul v. State, 43 Okla. Cr. 56, 277 P. 278.

The Supreme Court of Oklahoma in Hafer v. Lemon, 182 Okla. 578, 79 P. 2d 216, said:

"Section 272, O. S. 1931, [12 O. S. 1951 § 385], does not prevent one spouse, after the marriage relation has terminated, from testifying in a case in which the other is a party as to independent facts within the knowledge of the witness, and not coming within the definition of privileged communications."

See, also, State v. Nelson, 39 Wash. 221, 81 P. 721; State v. Dixson, 80 Mont. 181, 260 P. 138, 139. Rennie Hoover's testimony was in relation to independent matters, what she saw and knew of her own knowledge, or what the defendant disclosed in the presence of third parties, and there was no disability at time of the trial.

C. C. McIntosh, night clerk at the Roberts Hotel in Drumright, testified that DeWolf registered at the Roberts Hotel on August 30, 1946 at 12:20 a.m.; and also registered on September 2, 1946 at 12:25 a.m., both registrations being under the name of Fred Van Sandt. These registrations under the assumed name were admitted by the defendant in his testimony.

Mrs. Ada Hoover, mother of Rennie Hoover, corroborated Reenie's testimony to the effect that the defendant DeWolf left a footlocker at her house with the name of Wolff on it. She said he told her the trunk belonged to his brother who was killed in service. The Tulsa police officers took the trunk and its contents from her house. She also testified the defendant was at her house about August 15, 1946 in Mannford, Oklahoma, looking for Rennie Hoover. She told the defendant that Rennie and Maudie Birch were in San Pedro, California, at her sister's. The record shows the defendant left for California and Mrs Hoover testified that the defendant returned to Oklahoma about  he 28th or 29th with her daughter Rennie and other parties.

Deputy Sheriff P. E. Woodruff of Riverside, California, testified to the defendant's being at the Riverside Hospital and his investigation in regard thereto. He said that he went to the defendant's apartment No. 11 at the Graham Courts and there found Rennie Hoover, Maudie Birch and Edward Hoover, a juvenile. Rennie Hoover was placed under arrest and confined in jail. Among the defendant's effects at Apartment 11 picked up by the officers was a brief case that belonged to Mr. Wolff containing 4 pistols, among which was the 45 Colts automatic stolen from Mr. Wolff in Tulsa, Oklahoma, on the night of August 14, 1946. This 45 Colts automatic pistol was the one identified by Wolff as being his, No. 197335. It was properly traced to the F. B. I. for ballistic examination and offered in evidence, etc.

Maudie Birch, Rennie Hoover's companion who was with her when they met the defendant as hitchhikers from Vincennes, Indiana, in July 1946, and who made repeated trips to and from California with the defendant and Rennie Hoover, was present when the Deputy Sheriff P. E. Woodruff in Riverside, California, seized the defendant's pistols. She identified the brief case containing them as the defendant's and said she saw the officers take the guns out of it.

John D. Hoover, brother of Rennie Hoover, testified the defendant, his mother and sister were looking over some of the things in the trunk bearing

the name of Wolff after it was left at Mrs. Hoover's house by the defendant, all of which the defendant said belonged to his dead brother killed overseas. The defendant gave a slide rule to John Hoover that bore on it the name of Wolff. These effects were turned by the witness to Officer Stege of the Tulsa Police Department.

Captain Thomas R. McGaff of the sheriff's identification bureau of Riverside, California, traced the 45 Colts and testified in addition, that he talked with the defendant DeWolf in December 1946 about the guns and brief case. He said the defendant told him he was the owner of them and that he got them below San Diego, California, out of a stolen car.

George A. Berely, Special Agent of the F. B. I Laboratory, Washington, D. C., qualified as a ballistic expert and testified to receiving from the Tulsa Police Department the 45 Colts automatic pistol and the bullet taken from the skull of Officer St. Clair. He related that it was his conclusion that the bullet "handed to me was fired from this gun", the 45 Colts automatic which was stolen from the Wolff automobile and found in defendant's possession in California. He also identified 2 cartridge cases, one found at the scene of the shooting of Officer Harding and another picked up by Officer Headrick at the scene of the shooting where the Pontiac was abandoned, as being fired in the Colts 45 automatic taken from the defendant's effects in his apartment in Riverside, California.

This in substance constitutes the state's case in chief. It presents a most convincing chain of evidence.

The defendant's evidence was in substance to the effect that he denied the theft of the property of Mr. Wolff, the Kingsley Pontiac, the Erchenbrack car, but admitted he passed through Tulsa on his way to California from Massachusetts on August 14, 1946. He admitted seeing Mrs. Hoover in Mannford, Oklahoma, on about August 14, 1946. He testified to spending a night in the Commercial Hotel in Drumright on August 14, 1946. He admitted he arrived in Oklahoma on August 29, 1946 from California. He admitted registering at the Roberts Hotel on August 29 as Fred Van Sandt. On August 30 he testified "I believe I told Rennie I was going to Oklahoma City and I left them and I hung around town a short while and I started out towards Guthrie and I decided to go back and see if I could find a person that I had known slightly and I went over to a town called Jennings and I hung around most of the day there. I could not find the fellow I was looking for, so I remembered the dance, I was supposed to meet them at the dance so later on that afternoon", here his delineation broke off abruptly. He said he went then to find Victor Everhart whom he said he gave a hitchhike ride from Vincennes, Indiana, previously "Everhart was suspected and charged by the then county attorney the Honorable Dixie Gilmer with this crime and later was killed by officers before trial". The charge herein involved was filed by Honorable Elmer Adams, then county attorney of Tulsa County. The defendant never found Everhart. He related an incident in regard to a dog he let into a little cafeteria in Jennings. The dog got some meat off the meatblock in the kitchen, he said, and the proprietor "throwed both him and the dog out, and that he took the dog with him" and together they went back to Drumright. He arrived back there about 5:00 p. m., he related, and inquired as to the location of the dance hall but when he got to it, nothing had got under way yet. He testified he hung around until he met Maudie Birch's kid sister and she informed him she had not seen them. Defendant said he finally bumped into a fellow that knew Everhart, he related, and this man agreed to help him find Everhart. He testified their search covered Mannford and between Cushing and Drumright and to Oilton and Sand

Springs to John Birks' place. He testified he was not closer to Tulsa than John Birks' place in Sand Springs on the night of August 30, and positively denied he was in Tulsa. He testified he stopped there to get lunch meat or something. He said he was stopped twice that day by officers. Later in his testimony he said that he was stopped three times by officers. He said they apparently were looking for whiskey he thought, and laughed and sent him on his way. Finally this fellow whom he never identified, wanted to go back to the dance in Drumright and he took him. The ticket taker would not let him in because he did not want to dance, just wanted to look around. He never did find Rennie Hoover. So he went to the hotel about 9:30 p. m., and checked in, he testified. He said he stayed at Drumright or vicinity for three or four days looking for Everhart, just sitting on the street and watching the people go by. On Sunday he related he parked his car in front of the Roberts Hotel and went to get something to eat and when he returned Everhart was sitting in his car. That evening, he said, he got something from Everhart. He said, it was Wolff's footlocker and pistols for which he traded to Everhart other pistols he had. Everhart was supposed to meet him and they were supposed to go to California together but Everhart did not show up, he said, and so on September 2, he again left for California with Rennie Hoover. He admitted his criminal record as hereinbefore set forth. The defendant admitted he had a conversation with Captain McGaff and told Captain McGaff that he got the guns in San Diego. He described Everhart as being about his size but a little slenderer and said he had a sharp face and was much darker than he was.

This in substance constitutes the essential features of the defendant's testimony in his own behalf. The defendant called in his case in chief, Charles A. Shaw, machinist of Tulsa, who testified that about 6:00 p. m., on August 30, 1946 he was on his way home from work and that he passed a 1942 Pontiac sedan with only one man in it, and that as he passed he was about three feet from the man. This fellow was being pursued by police officers. He said he got a good look at the man and said the defendant was not that man. He said the police siren was not on and he heard no shooting. What attracted his attention was, he said, it looked like the officers were trying to pass the man in the Pontiac. He said he doubted that he could identify the officers who were driving the police car.

The state called in rebuttal Mr. J. W. Tidwell, Jr., of Tulsa, who testified his place of business was located in the vicinity of Robert Kingsley's place of business, and that on the afternoon of August 30, 1946 he saw a man get into Kingsley's 1942 black Pontiac automobile and drive it away. He identified Carl DeWolf as the man who he saw drive the car away. He testified that the car was within 20 feet from the place he came out of the door.

James O'Neeley, another witness in rebuttal for the state, testified that he was serving a life term in the Oklahoma Penitentiary, and that on September 3 or 4, that he met Everhart at Dayton, Ohio. Everhart, he said, was driving a new 1946 Chevrolet automobile and that he and Everhart went from there to Richmond, Indiana, and finally came from there to Tulsa between 5:00 and 6:00 o'clock on the morning of September 12, 1946. During this time he said Everhart had with him a 32 automatic and another pistol he picked up in St. Joseph, Missouri.

Captain Thomas R. McGaff was called in rebuttal for the state, and stated that on January 17, 1947, he had a conversation with DeWolf in the county jail in Santa Ana and DeWolf told him he had never been in Tulsa and could not understand how he could be connected with the theft of the property from Mr. Wolff's automobile. He further related that he showed DeWolf the 45 Colts

automatic and the 22 target pistol and he stated that they were his guns and that he liked to shoot targets with them.

Officer Harry S. Stege of the Tulsa Police force, testifying in rebuttal, said that in January or February 1947 he talked to DeWolf in Santa Ana, California, and that DeWolf denied to him that he had ever been in Tulsa, and stated that he got the guns in or south of San Diego, California.

Fred Everhart, brother of Victor Everhart, testified that his brother weighed about 150 pounds, that his features were broad and he had brown hair. He related that one of his eyes was crossed and that he had heavy eyebrows. They were wide apart and outstanding. He identified his brother's picture, and testified there was no resemblance between the defendant DeWolf and his brother Victor Everhart "in any way, manner, shape or form".

One cannot read this evidence even casually without being convinced that it is sufficient upon which the jury could find the defendant guilty as charged. We are of the opinion that this conclusion is inescapable. We would be loathe to affirm the sentence imposing the death penalty were the case predicated solely upon identification, as strong as it is, but the fact that the instrument of death was found in the defendant's possession as well as the other evidence tending to connect the defendant with the crime, and the weakness of the story related by him in his own behalf makes the evidence of guilt most conclusive. We are of the opinion that the defendant's attempt to shift the evidence of guilt to Victor Everhart was only an afterthought, and the jury was entirely justified in ignoring the same.

Mr. George Campbell of Sand Springs, Oklahoma, deserves commendation for the brief which he prepared in behalf of the defendant appearing amicus curiae. Mr. Campbell did not represent the defendant in the trial of this case.

Finding no error in the record to justify modification or reversal, the judgment of the district court of Tulsa county, Oklahoma, is accordingly affirmed. The original time for execution of the judgment and sentence having expired due to the pendency of this appeal it is considered, ordered and adjudged that the judgment and sentence of the district court of Tulsa county, Oklahoma, be carried out by electrocution of this defendant on the 31st day of July, 1952, or in such manner as provided by law and may be in effect on said execution date.

JONES and POWELL, JJ., concur.