## PIERPONT v STATE

Ohio Appeals, 3rd Dist, Allen Co

No 641. Decided June 18, 1934

Miss Jessie Levy, William Fogarty and Clarence C. Miller, Lima, for plaintiff in error.

Earnest M. Botkin, Lima, Joseph H. Flick, Lima, and Benjamin Motter, Lima, for defendant in error.

WILLIAMS, J, (6th Dist) sitting by designation.

## OPINION

By WILLIAMS, J.

The indictment follows the form prescribed by the statute, and the court properly overruled the demurrer.

The indictment, when it was returned, was signed and subscribed by Norman Evans as foreman of the grand jury, but he failed to write the words "A true bill" thereon above his signature.

Sec 13436-17 GC, provides:

"At least twelve of the grand jurors must concur in the finding of an indictment, and when so found, the foreman shall endorse on such indictment the words 'a true bill' and subscribe his name as foreman."

It appears that the bill of indictment was found and returned in the regular way and that the omission was inadvertent. Motion to quash on this ground was overruled and the court permitted the defect to be corrected by writing above the signature of the foreman, the omitted words.

As §13437-29 GC permits the amendment of an indictment before, during or after trial, "in respect to any defect, imperfection or omission in form or substance," we are of the opinion that the court below did not commit prejudicial error in overruling the motion to quash and in permitting the amendment to be made. **Breinig v State, 124 Oh St 39.**

It is contended that the court erred in permitting the defendant to be handcuffed and shackled with leg irons during the trial. However, during all the time the defendant was on the witness stand the shackles were off.

It is true that ordinarily it is an invasion of the rights of an accused person to force him to remain shackled during his trial, but the right to be free from bonds is not absolute and there may be exceptions. We think the rule is accurately and concisely stated in 8 Ruling Case Law, page 68, §22, from which we quote.

"At early common law when a prisoner was brought into court for trial, upon his plea of not guilty to an indictment for a criminal offense, he was entitled to make his appearance free from all shackles or bonds. This is his right today in the United States. The spirit of the law is that a prisoner, upon his trial before a jury, shall have the unrestricted use of his limbs, and shall not suffer any physical bonds or burdens which might tend to confuse or embarrass his mental faculties. Furthermore, a prejudice might be created in the minds of the jury against a prisoner who should be brought before them handcuffed and shackled, which might interfere with a fair and just decision of the question of the guilt or innocence of such prisoner. It is recognized that it lies within the discretion of the trial court to have the prisoner shackled when it is manifest that such a precaution is necessary to prevent violence or escape, and an appellate court will not revise the trial court's action except in a clear case of abuse of discretion. * * *"

There are additional statements bearing upon the question, in the remainder of this paragraph, but some of them, in our judgment, are not wholly sound and we have not quoted them.

In the case of Hall v State, 159 NE, 420, the Supreme Court of Indiana has passed upon the question; in that case the court caused the defendant to sit with his feet fettered during the trial. He was convicted and the conviction affirmed.

In the course of the opinion, the following significant language appears:

"Blackstone early stated the law to be (4th Com. 332) that: 'The prisoner must be brought to the bar without irons or in any manner of shackles or bonds, unless there be evident danger of escape, and then he may be secured with irons,'
—and the courts have uniformly held that a defendant in a criminal trial is always entitled to appear unfettered if he properly conducts himself while under arrest and during the trial. But, where the trial court has good reason to believe that the defendant is a desperate and dangerous criminal, and that there is serious danger of his harming those about him in the court room, or of his attempting to escape or being released by others, it may exercise its sound

and enlightened discretion, and order him restrained in such reasonable manner as it deems necessary. (See cases cited in 16 C. J. 819; 8 R.C.L., 68; note, 5 Ann. Cas. 959; note, 39 L.R.A. 821), and the action of the court in so doing will not be error, unless there has been a clear abuse of discretion. (Gray v State, 1924) 99 Tex. Cr. R. 305, 321, 268 SW 941, 269 SW 1056; New Mexico v Kelly (1882) 2 N. M. 292; Poe v State (1882) 10 Lea (Tenn.) 673). In the modern court room as little show of arms must be made as possible, and ordinarily the necessary restraint can be accomplished by placing un-uniformed guards near the prisoner (State v Kenny (1907), 77 S. C. 236, 57 SE 859; State v Duncan (1893), 116 Mo. 308, 22 SW 699; State v Rudolph, (1904) 187 Mo. 89, 85 SW 584), or, as was done in this case, by shackling his ankles (Faire v State (1877), 58 Ala. 78, 82). While the appellant admits that the necessity for a prisoner to be restrained by shackles or manacles during the trial must be left to the sound discretion of the trial judge, as decided by the court in McPherson v State, (1912) 178 Ind. 583, 99 NE 984, he maintains that there must be some evidence offered to the court at the trial of imminent danger of escape or violence to others, based upon the conduct of the prisoner at the time of the trial, to authorize the court to exercise its discretion to require physical restraint of the prisoner, and cites State v Kring (1879), 64 Mo. 591, and State v Williams (1897), 18 Wash. 47, 50 P. 580, 39 L.R.A. 821, 63 Am. St. Rep. 869."

In that case the court also held that it was not necessary that the court's action be based wholly upon matters that occurred at the trial, and this would seem to be the better rule. We quote again from the opinion.

"Appellant's contention that the knowledge upon which a court bases its discretion to refuse a prisoner's request that fetters be removed from his legs must come only from evidence offered at the trial does not appear to us to be sound."

All the authorities seem to state that there is an exception to the rule that the defendant must not be shackled, handcuffed or bound during trial where there is evident danger of escape or rescue. Blair v Commonwealth, 188 SW 390.

It is also claimed that the court erred in permitting armed officers to remain in the court room. It seems that the present sheriff, who is the son of the late sheriff, was in the court room at one time with a machine gun, but the court ordered him to take it out and he did not come in with it again. It also appears that some officers were about the room with belts on with pistols in the holsters, and that one deputy had a rifle at least part of the time. It is further contended that the court erred in permitting the militia to form a cordon of soldiers about the court house and only allow people to enter who had been properly searched and who presented passes, and that the searching process also applied to prospective jurors who were called in connection with the trial of the case.

The reasons which prompted these precautions, all must admit, were unusual. A situation exactly like it has not been presented, so far as we know, in the history of the country. It was common knowledge that John Dillinger escaped from prison in Indiana by threatening officers with a mock pistol, and that it was commonly reported that he would attempt to liberate Pierpont and other associates from the Allen County jail and thus repay the debt of gratitude he owed because they had delivered him previously from that same jail by threats, intimidation and the killing of the sheriff. The papers throughout the United States were ablaze with the news of Dillinger's whereabouts and the information came through the press, and it was a matter of common knowledge, that he was heavily armed and unwilling to be taken alive; in fact, that he would shoot and shoot to kill. It was evident to the court and everyone else, and so a matter of common knowledge, that Dillinger, Pierpont and their pals were dangerous gangsters, bank robbers and killers determined to have their liberty, no matter what the cost in human life. Moreover, the dangerous character of these men is disclosed not only by evidence adduced by the state but also from the defendant's own testimony while on the witness stand in his own defense.

It does not seem that it was necessary to take evidence upon these questions, because the facts were so notorious that the man on the street knew them, and presented a situation which threatened the orderly administration of justice itself. It was the duty of the trial judge to prepare to meet any emergency, and he did so, and it was not only within his sound discretion, but his duty, to take steps which would forestall forcible release of Pierpont and his companions in crime by Dillinger and his gang.

Under these circumstances this court cannot say that the trial judge abused its discretion in taking the unusual precautions that he did. In our judgment there was no prejudicial error in this respect.

It is also claimed that the defendant was denied his constitutional right of a public trial. The authorities are practically unanimous that the right to a public trial does not mean that the court cannot exclude some of the public in the erercise of a sound discretion, and conditions may arise under which it is proper and necessary to exclude a portion of the public. 8 Ruling Case Law, page 76, §30.

In the instant case it does not appear that the public was excluded from the court room, but that every person who desired to enter the court house and pass the cordon of soldiers, was required to have a pass signed by either the judge or the brigadier general in command of the militia, or both. It does not appear that anyone was excluded who, after search and inquiry, was found to be a person of law abiding intentions. We think the right to a public trial was not denied the defendant in this case.

Many other questions have been made, including many on the admission and rejection of evidence. It is hardly within the realm of possibility that a case of this character and length could be tried without some error being committed, and we do not say that every ruling of the trial court on the admission and rejection of evidence was free from error, but having in mind the liberality and freedom from technicalities which now characterize the administration of criminal justice under the new code, and especially the language of §13449-5 GC which requires that a judgment of conviction shall not be reversed for error on the admission and rejection of evidence unless it shall affirmatively appear from the record that the accused was or may have been prejudiced thereby, we cannot say that any prejudicial error resulted from the ruling of the court on the admission and rejection of evidence. **State v Moon, 124 Oh St 465.**

The evidence against the defendant is overwhelming and convincing and warranted the conclusion reached by the jury in its verdict.

As we find no reversible error apparent upon the face of the record, the judgment will be affirmed.

KLINGER and GUERNSEY, JJ, concur.