THE STATE OF OHIO, APPELLEE, *v.* FARMER, APPELLANT.

(No. 256—Decided March 26, 1951.)

*Mr. Myron Rosentreter,* prosecuting attorney, and *Mr. Don Wargowski,* for appellee.

*Mr. Leslie E. Meyer,* for appellant.

CONN, J. On September 24, 1950, the defendant shot Helen C. Noble, inflicting a fatal wound from which she died four days later. Subsequently, defendant was indicted for murder in the first degree by the grand jury of Ottawa county and on arraignment entered a plea of not guilty. On the trial, the jury returned a verdict of guilty with a recommendation of mercy. Thereafter, the trial court entered on the verdict a judgment that the defendant be imprisoned in the Ohio penitentiary for and during his natural life. From that judgment defendant has appealed to this court.

We take up first the claim of defendant that the verdict was not sustained by sufficient evidence (this being one of the assignments of error). It is disclosed by

the record that Helen C. Noble and her oldest son (who at the time of the trial was 17 years old) had resided in an apartment at 121½ Madison avenue in the city of Port Clinton for a period of three years or more prior to the fatal shooting. For two years preceding the shooting the defendant had resided in the same apartment.

It appears further that the defendant and the deceased had quarreled from time to time during the period they had lived together, and that defendant on one or more occasions had threatened Mrs. Noble with bodily harm. The evidence also discloses, or tends to show, that defendant was of a jealous disposition; that he regularly drank intoxicating liquor; and that on one occasion during a quarrel he threatened Mrs. Noble with a gun.

The evidence shows also that on the evening of September 23, 1950, preceding the fatal shooting, Mrs. Noble, in company with defendant's sister, visited several places in Port Clinton and about 10:30 p. m. went to the home of the Veterans of Foreign Wars in that city, where refreshments, music, and a dance floor were provided. Later in the evening defendant appeared. While the evidence is, in part, conflicting as to the general attitude of the defendant toward Mrs. Noble and as to what occurred prior to the time Mrs. Noble left, there is credible evidence that the defendant and Mrs. Noble had several arguments and that the defendant was not on friendly terms with her. During the evening defendant walked up to the bar where Mrs. Noble was sitting, tossed a bullet on the bar, and said, "that is for you."

Mrs. Ralph Knodel, wife of the canteen manager of the Veterans of Foreign Wars home, was called as a witness by the state and testified that she was assisting her husband on the evening of September 23, 1950,

and observed the attitude of the defendant toward Mrs. Noble and the unfriendly conversations between them.

We quote briefly from her direct examination and cross-examination:

"Q. Do you know when—about what time Helen Noble left the VFW? A. It was between one and one-thirty, I would say.

"Q. Did she make any statement just prior to her leaving that—in the presence of the defendant? A. Yes, she went over to get her coat and when she came back she went to pick up her pocketbook, he asked her where she was going, and she says 'I am going home' and she says, 'I don't want you to follow me.' He said, 'Well, we will see about that,' and the two of them walked out together. He was behind her.

"Q. He was behind her? A. That is right.

"Q. That is all."

Cross-examination by Mr. Meyer.

"Q. Now, do you know what he meant—or what she meant—Mrs. Knodel, when she said 'I don't want you to follow me'? A. She just didn't want him to go home with her.

"Q. Well, is that necessarily what that means, or does it mean that she wanted him to go home with her, and not follow her? A. As a matter of fact, she said 'You darkened my door for the last time.'

"Q. What is that? A. She said 'You have darkened my door for the last time.'

"Q. Why didn't you tell that when Mr. Rosentreter was asking you, then? He asked what she said; why didn't you tell that? A. After all, I am a little nervous, you know.

"Q. Oh, are you; it is not because you are not trying to tell the jury the truth, is it? A. No, positively not."

The defendant did not take the witness stand. The state introduced in evidence a transcription of a recording of a voluntary statement made by the defendant to the chief of police, the evening following the shooting, wherein defendant stated, among other things, that the argument with Mrs. Noble started in the Veterans of Foreign Wars barroom, and that "I was just jealous and didn't want to see her out." Defendant said he did not remember the bullet incident. Defendant stated also that "we was arguing and left and was going home * * *. I was walking with her, holding her arm." The defendant stated that he then pulled the gun out of his pocket and it went off and he did not point it at Mrs. Noble.

The evidence discloses further that the gun was a P-38 Luger military gun with a heavy trigger pull; that the bullet entered the body immediately below the left breast; and that it went through the body and was found later imbedded in the "front of the store show window." The victim fell to the sidewalk, where she was picked up by police officers and taken to a hospital. She died four days later as a direct result of the bullet wound. The defendant left the scene of the shooting and, shortly afterward, contacted the police and admitted that he had shot Mrs. Noble.

After a careful study of the record, it is our opinion that the verdict was sustained by sufficient evidence, and that it is not manifestly against the weight of the evidence.

At the opening of the trial and during the time certain prospective jurors were being examined, the defendant, in handcuffs, was seated at or near the counsel table with a deputy sheriff. Objection was made to having the defendant manacled in the courtroom, whereupon the trial judge called the sheriff and in

open court inquired of him whether there was any reason to have the defendant handcuffed. The officer answered in the negative, but indicated that he did not want to be responsible, unless defendant was handcuffed, since the crime charged was serious. The officer was then informed that the matter of restraining the defendant was the sheriff's responsibility and not that of the judge. Defendant's objection was overruled, and thereupon defendant moved for a mistrial on the ground that he was prevented from having a fair trial. This motion was overruled.

In the Code of Criminal Procedure it is provided that "it shall be the duty of the judge to control all proceedings during the trial" (Section 13442-2, General Code). The statute appears to be in confirmation of the duty and function of the trial judge in presiding over a jury trial. The duty thus imposed on the trial court is an affirmative one to be exercised within the limits of sound discretion in order that there may be no bias or prejudice against the accused or a denial to him of a fair trial. We call attention to the following authorities: *Pierpont* v. *State,* 49 Ohio App., 77, 195 N. E., 264; *Makley* v. *State,* 49 Ohio App., 359, 197 N. E., 339; *State* v. *Bryan,* 69 Ohio App., 306, 43 N. E. (2d), 625; *State* v. *McKay,* 63 Nev., 118, 165 P. (2d), 389; 14 American Jurisprudence, 855, Section 132; 23 Corpus Juris Secundum, 312, Section 977.

In the instant case the trial court, although erroneously indicating it was the responsibility of the sheriff to determine whether the accused should be manacled in the courtroom during the trial, nevertheless determined that the motion of defendant should be overruled. It is our opinion that, under the circumstances, that ruling was within the court's sound discretion and did not prejudicially affect the defendant.

Defendant assigns as error the failure of the court to charge on manslaughter in its general charge, and that the charge on manslaughter given following the defendant's request was incomplete. It appears that the court gave the jury the accepted definition of manslaughter as being "the unlawful killing of another either upon a sudden quarrel in the heat of passion or while in the commission of an unlawful act." The court, after elaborating rather fully on the first part of the definition, stated that, "if the evidence fails to show adequate provocation for the killing, a verdict for manslaughter may not be returned." No instruction was given to the jury relative to the killing of another "while in the commission of an unlawful act," to wit, carrying concealed weapons, as in this case. While this appears to be an error of omission, it is our opinion that the error was not prejudicial, as there was no credible evidence tending to show that the mortal wound was accidentally inflicted.

The remaining errors assigned have been considered, and it does not appear in any instance that the verdict of the jury was prejudicially affected.

On the entire record, it appears that defendant had a fair trial, and that the errors assigned were not prejudicial. There is thus presented a case which comes within the curative provisions of Section 13449-5, General Code. This statute is mandatory and prohibits the court from reversing a judgment of conviction, on specified grounds or "for any cause whatsoever unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

*Judgment affirmed.*

CARPENTER and FESS, JJ., concurring. We do not concur in the statement that it was within the court's

sound discretion to overrule the defendant's motion that the handcuffs be removed in the courtroom. The evidence did not disclose a situation where there was any likelihood that the defendant might try to escape, and, if it did, the presence of an additional deputy sheriff, which the court could have ordered, would have secured the situation. Seldom can circumstances justify the manacling of an accused during his trial proceeding.

However, from the evidence, as stated in the opinion, and the whole record, the guilt of defendant was so manifest that the presence of the handcuffs was not prejudicial to him, error though it was.