John Elmer **WOODARDS**, Petitioner,

v.

E. L. **MAXWELL**, Warden, Ohio Penitentiary, Respondent.

Civ. A. 8045.

United States District Court
S. D. Ohio, E. D.

Sept. 10, 1969.

Gerald A. Messerman, Cleveland, Ohio, for petitioner.

Paul W. Brown, Atty. Gen. of Ohio and Leo Conway, Asst. Atty. Gen., for respondent.

## OPINION AND ORDER

KINNEARY, District Judge.

This is an action brought by the petitioner, a state prisoner, for a writ of

habeas corpus under the provisions of 28 U.S.C.A. § 2241 et seq. The constitutional errors asserted by the petitioner in his Supplemental Amended Petition are essentially as follows:

1. Petitioner was denied a fair trial in violation of the due process clause of the Fourteenth Amendment of the United States Constitution by being compelled to appear before the jury trying him, in a trial which lasted from January 20, 1964 to January 31, 1964, with his hands shackled and strapped to his body.

2. Petitioner was denied, (1) a fair trial in violation of the due process clause of the Fourteenth Amendment of the United States Constitution, and, (2) the right to confront witnesses against him in violation of the Sixth Amendment of the United States Constitution as incorporated by the due process clause of the Fourteenth Amendment by the prosecutor's repeated unsworn assertions of personal knowledge of facts damaging to petitioner's defense.

3. Items seized from petitioner's home in violation of protections guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution were introduced into evidence against petitioner at his trial.

4. Oral admissions obtained from petitioner after seventy-one hours of detention and interrogation were introduced against petitioner at trial in violation of rights guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

5. In determining what evidence should be admitted and what evidence excluded on the question of petitioner's mental condition, and in instructing the jury regarding the test to be applied in determining whether petitioner was mentally responsible for having committed the offense charged, the trial court, in violation of the due process clause of the Fourteenth Amendment of the United States Constitution, precluded examination of the question of petitioner's capacity to control his behavior.

6. By sentencing petitioner to death pursuant to a jury verdict which, under Ohio law, carries a mandatory death penalty, the trial court violated rights guaranteed by the cruel and unusual punishment clause of the Eighth Amendment and by the due process clause of the Fourteenth Amendment of the United States Constitution.

7. By instructing the jury that petitioner bore the burden of proof on the issue of insanity, and that he could sustain that burden only by demonstrating, by a preponderance of the evidence, that he lacked the mental capacity to commit the offenses charged, the trial court erroneously relieved the state of the burden of establishing guilt beyond a reasonable doubt in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

8. By striking from the jury panel all veniremen who expressed conscientious objection to the imposition of the death penalty, the trial court denied petitioner the right to be tried by a fair and impartial jury in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

9. By entrusting the jury with the absolute power to determine whether petitioner should live or die if he were found guilty of the offense charged, and by offering no reasonable guidelines to the jury relevant to the exercise of discretion vested in the jury, the trial court denied petitioner a fair trial in violation of the due process clause of the Fourteenth Amendment of the United States Constitution.

Under the doctrine of Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) the Court held an evidentiary hearing in order to reveal material facts, especially relative to the petitioner's claim concerning his shackling at trial, which were not adequately developed at the state court proceedings.

Both parties have submitted post hearing memoranda and the Court has con-

sidered this case on the basis of these memoranda, all other pleadings filed by either party, all exhibits submitted and received in evidence at the hearing, the testimony of all witnesses, and finally, the oral arguments of counsel.

*Facts:*

On Saturday, July 13, 1963, Margaret Van Arsdale, a woman 85 years of age, was discovered dead in the utility room of her home in Columbia Station, Ohio (a small community just west of Cleveland, Ohio). A blanket was wrapped around her body and tied with her nightclothes and underclothes.

An autopsy showed that all her ribs had been broken, her spleen ruptured and her perineum and vaginal wall torn. She had suffered injuries to her head, left forearm, right hand and other parts of her body.

About noon that same day, two sheriff's cars were dispatched to the residence of the petitioner, John Woodards, a former tenant of the victim. No one was at home. A deputy entered the house and took a pair of work boots which he placed in his car. Shortly thereafter, Woodards arrived and was arrested by the officers. He was informed that he was wanted for questioning in connection with a gas station robbery which had occurred the night before.

One of the deputies accompanied Woodards into his house where the petitioner identified and gave to the deputy the clothes which he said he had been wearing the night before. He was then taken to county jail. The deputy later returned for more clothing which the petitioner's wife gave him.

Woodards was questioned briefly, was fingerprinted on July 13 and was held in jail. On Monday, July 15, at about 1:15 P.M., he was questioned for the

first time concerning the murder of Mrs. Van Arsdale. At that time, he was informed by a deputy sheriff that he was not required to make any statement and was advised by an assistant prosecutor of his federal and state constitutional rights, including the fact that any statement he might make could be used against him.

The deputy in charge of the investigation read to Woodards from a book on the subject of sexual deviations of older women and asked him whether he did not want to relieve the load on his shoulders. Woodards then made a statement which the court reporter transcribed. He agreed to go to the Van Arsdale residence and reenact the incident. During the drive to and from the scene, he was questioned, and the questions and answers were taken down in shorthand by a deputy sheriff. Upon their return to the jail, Woodards was taken before a magistrate at the Elyria Municipal Court and charged with first degree murder. On July 16, he was represented by counsel, waived preliminary hearing and was bound over to the Grand Jury.[1]

The petitioner was indicted for first degree murder on July 23, 1963 and at the arraignment on July 26, while represented by counsel, Woodards pleaded not guilty.

In the trial before a jury, Woodards testified in his own behalf as to the events which took place on the night of July 12, 1963.[2]

The jury convicted the petitioner of murder in the first degree, without a recommendation of mercy, and the mandatory death sentence was imposed. After appellate affirmance of this conviction in the Ohio courts (see State v. Woodards, 6 Ohio St.2d 14, 215 N.Ed.2d 568 (1966)), this action for a writ of habeas corpus was filed and the petition-

---

1. This summary of facts was taken substantially from the opinion in State v. Woodards, 6 Ohio St.2d 14, 215 N.E.2d 568 (1966).

2. There are some variations from the facts as previously stated and the petitioner's testimony at trial. Insofar as revelant to the issues raised in this proceeding, these variations will be discussed and resolved in the body of this Opinion.

er was granted an indefinite stay of execution of his death sentence by this Court on December 23, 1966 pending the outcome on the merits of this action.

■ The Court first focuses its attention on the contention of the petitioner which relates to the striking from the jury panel all veniremen who expressed conscientious objection to the imposition of the death sentence. The resolution of this issue hinges directly on the applicability of a recent case decided by the Supreme Court of the United States, Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

In *Witherspoon,* the Court attempted to be as clear as possible in stating the holding of the case.

> Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected. *Witherspoon, supra,* 391 U.S. at 521–523, 88 S.Ct. at 1776–1777.

Among the exhibits admitted by the Court during the course of the evidentiary hearing was Joint Exhibit 1–D, which is the transcript of the voir dire examination of the jurors held prior to the petitioner's murder trial. This examination took place on January 20, 1964, and contains the questions and answers of some twenty-seven members of the jury panel. Of these twenty-seven persons, twenty-four of them were examined to determine their qualifications to sit as regular jurors, while the remaining three were examined in relation to their qualifications as alternate jurors. Because none of the alternate jurors participated in the deliberations or verdict at the conclusion of petitioner's trial, the Court will not consider their examination relevant in the discussion of the *Witherspoon* issue.

As has been stated, there were twenty-four members of the jury panel questioned with respect to their qualifications as regular jurors. Of this number, twelve were excused, five peremptorily by the defendant-petitioner, and seven by the trial judge. The circumstances under which these seven members of the jury panel were excused by the trial judge constitute the present area of judicial inquiry.

Joint Exhibit 1–D reveals the following discussion with a prospective juror concerning the imposition of capital punishment:

Q. [by the Court] Let me ask you this broad question: Do you know of any reason why you could not sit here and listen to the evidence and render a fair and impartial verdict?

A. [by Gilbert A. Fairchild, a venireman] I guess it's proper to mention this that I—by hearsay I understand that in a first degree murder case a person who does not approve or believe in capital punishment should not sit on a jury, is that correct?

Q. That's a correct statement?

A. That is the case.

Q. In other words, you have a belief and you are convinced that in your own conscience you do not believe in capital punishment?

A. That is correct.

Q. Is that because of a religious—

A. No.

Q. —basis?

A. No.

Q. Have you had that conviction for any length of time?

A. Oh, I'd say five years.

> The Court: Mr. Mikus [the prosecutor], do you care to inquire?
> Mr. Mikus: We do not care to inquire.
> The Court: Well, I believe I will just excuse you, Mr. Fairchild.

The Court respects your convictions and your stand on this and, for that reason, you would be disqualified and the Court will excuse you. (Jt. Ex. 1–D, pp. 324–325).

Joint Exhibit 1–D further reveals this colloquy with respect to a second prospective juror:

Q. [by the Court]   Well, let me put it to you another way.   Maybe we can get an expression from you this way.

Would it embarrass you to vote the death penalty in a proper case if you were selected in this case?

A. [by Robert A. Cobbs, a venireman]   I believe it would a little bit.

Q. Now, the next question:   Even though you were, if you were embarrassed to vote the death penalty, would you, in a proper case, vote a death penalty?

A. Yes, I suppose I would.

The Court:   Well, I believe in view of his answers, which are not too clear, really, and since this is a serious matter, Mr. Cobbs, you understand that if you have any reservations about capital punishment, then, perhaps, you should not sit on this jury.

Do you have some reservations about capital punishment?

Mr. Cobbs:   Well, there must be because—

The Court:   Well, I think, under those circumstances, this prospective juror should be excused at this point.

You may be excused.   (Jt. Ex. 1–D, pg. 276).

The preceding excerpts from the voir dire examination of the jurors at the petitioner's trial bring the *Witherspoon* issue squarely into focus.   This Court finds that the standards set by the Supreme Court of the United States in the *Witherspoon* case were violated by the manner in which veniremen were excused from jury service in the petitioner's trial.

The most that can be demanded of a venireman in this regard [i. e., his scruples against infliction of capital punishment] is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.   If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion.

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear, (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or, (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.   *Witherspoon, supra*, 391 U.S. at 522–523 n. 21, 88 S.Ct. at 1777.

It is clear to this Court that the expression of scruples against the imposition of capital punishment made by venireman Fairchild in no way indicates that he would automatically vote against its imposition without regard to the evidence adduced at trial or that his scruples would prevent him from making an impartial decision as to the defendant's guilt.   Further, with respect to the questioning of venireman Cobbs, the record clearly reveals that, after some admittedly ambiguous statements concerning his beliefs as to capital pun-

ishment, Cobbs would have voted for the death penalty in the proper case. Both of these veniremen were excluded from the defendant's jury for their beliefs with respect to capital punishment on a basis broader than is permissible under the Sixth Amendment to the Constitution of the United States as interpreted in *Witherspoon*.

There are cases decided subsequent to *Witherspoon* which have held the principles announced in that case to be inapplicable either because the veniremen had indicated that they would *automatically* vote against the imposition of capital punishment (see Segura v. Patterson, 402 F.2d 249, 252 (10th Cir. 1968)) or because there was no systematic exclusion of scrupled jurors, but in fact acceptance of some jurors even though they evinced conscientious scruples (see Bell v. Patterson, 402 F.2d 394, 397–399 (10th Cir. 1968)). The Court considers each of these cases to be inapplicable to the instant situation.

The Court determines, on the basis of the foregoing discussion, that the petitioner's right to a fair and impartial jury, as secured by the due process clause of the Fourteenth Amendment of the United States Constitution, was violated by the imposition of the death penalty by this jury.

■ The second alleged constitutional error which the Court will discuss on the merits is the contention of petitioner that his rights under the due process clause of the Fourteenth Amendment to the United States Constitution were violated because he was compelled to appear before the jury trying him with his hands shackled and strapped to his body.

The evidence received by this Court at the evidentiary hearing was in great part directed specifically to the circumstances surrounding this shackling. The Court notes that there is no dispute that the petitioner was, in fact, shackled during the whole course of his trial. Further, the testimony clearly shows and the Court so finds that the jurors were aware, at some point in the trial, that shackles were on the petitioner.

The Court has been able to discover only four Ohio appellate court decisions which discuss in any depth the issue of restraints on an accused at trial.

In Pierpont v. State, 49 Ohio App. 77, 195 N.E. 264 (1934), a case which involved a jail break from the county jail located in Lima, Ohio, by the notorious John Dillinger, the defendant made the contention that it was prejudicial for the trial court to permit him to be handcuffed and shackled with leg irons during the trial. The appellate court, in holding that the restraints placed on the defendant were within the discretion of the trial judge and that there was no abuse of that discretion shown, emphasized the unusual circumstances and the constant threat of a jail break. In a related case decided the same year, a similar ruling was made. Makley v. State, 49 Ohio App. 359, 197 N.E. 339 (1934).

A third decision from an Ohio appellate court is State v. Bryan, 69 Ohio App. 306, 43 N.E.2d 625 (1942). There the Court, citing both the *Pierpont* and *Makley* decisions, held that there was no abuse of discretion by the trial judge in allowing the defendant to appear before the jury in shackles. The Court also noted that the sheriff testified that he felt the restraints on the defendant were necessary. However, as pointed out in State v. Farmer, 90 Ohio App. 49, 53, 103 N.E.2d 289 (1951), the reliance by the trial judge on the opinion of the sheriff is not an exercise of discretion, but an abdication of it and it is erroneous for the trial judge to rely solely on the sheriff's opinion. Further support for this proposition can be found in other jurisdictions. See State v. Roberts, 86 N.J.Super. 159, 206 A.2d 200 (1965).

There is direct contradiction of testimony in the record of this case concerning the circumstances under which Judge Pincura, the trial judge, made the decision to hold the petitioner in shackles at trial. Both Judge Pincura and Mr. Otero, a member of the Lorain County Prosecutor's staff, testified that there

was a discussion before trial with both the petitioner and his counsel present, concerning whether the petitioner would be shackled at trial. Judge Pincura further testified in his deposition (Joint Ex. # 3) that Woodards' counsel conceded that there was an attempted jail break by the petitioner. (Joint Ex. # 3, 11–12) Neither this concession by trial counsel nor, in fact, any discussions between Judge Pincura and the petitioner or his counsel concerning the issue of shackling has been preserved by record, with the exception of the following colloquy.

Judge Pincura and Mr. Adams, petitioner's counsel, discussed the matter of shackling at the very start of the trial in this manner:

Mr. Adams: May his handcuffs be removed, Your Honor?

The Court: It will be up to the Sheriff.

Mr. Adams: If the Court please, may the record, at this time, show that I object to the defendant's being shackled in the courtroom.

The Court: The Court's ruling on the request to unshackle the defendant is that it is a question of security. It all depends on what the Sheriff's wishes are in the matter.

Has the Sheriff decided what—

A Deputy: We wish for the prisoner to remain shackled, Your Honor.

Mr. Adams: Well, at least can the belt be removed if the handcuffs remain on?

The Court: As I say, it is a question of security. It is up to the Sheriff.

Mr. Adams: Do you object to that?

A Deputy: We do request the same security we have on him at this time, Your Honor.

The Court: Very well, so ordered.

Mr. Adams: If the Court please, he is going to remain here for days. You can't expect him to remain in that position.

The Court: The Court has made a ruling. You may have your exception for the record, Mr. Adams. (Tr. Record, 6A–6B).

As facts with respect to the circumstances surrounding the shackling of the petitioner at his trial the Court finds that, (1) the petitioner, John Elmer Woodards, was never directly confronted with the allegation that he had attempted a jail break, (2) neither the petitioner nor his counsel ever admitted that the statements relating to the attempted jail break were true, (3) except for the one incident regarding certain tools that were found in the petitioner's prison cell and which were alleged to have been used for an attempted jail break, the conduct of the prisoner at all times prior to trial (including two trips to Lima State Hospital and one to Cleveland, Ohio for psychiatric examination) and also during the course of the trial gave no reason for the use of shackles during the course of the trial, (4) the tools found in the petitioner's cell were used to make what have been admitted as Petitioner's Exhibits 1, 2A, 2B, 2C and 2D and the use of these tools for any other purpose is unsupported by any credible evidence in the record, (5) the decision made by Judge Pincura regarding the issue of whether the petitioner was to be shackled at trial was not made in the exercise of his own discretion, but rather, as the clear import of the discussion between Judge Pincura and Mr. Adams at the initial stage of the trial reveals, was an abdication of that discretion to the opinion of the sheriff, and, (6) Judge Pincura, by his own admission, never considered reasonable alternative methods of providing for the security of the courtroom.

The Court feels that the New Jersey court in State v. Roberts, 86 N.J.Super. 159, 206 A.2d 200, 205 (1965) was correct in its statement that "[h]is (the defendant) being restrained must carry obvious implications even to the most fair minded of juries." In its appraisal of what procedures needed to be followed in order to obviate these implications

in all but the most extreme cases, the Court went on to say:

> The power to order a defendant to stand jury trial while handcuffed or shackled calls for a meaningful exercise of judicial discretion. The information upon which the judge acts need not necessarily come from evidence formally offered and admitted at the trial. \* \* \* However, such information or knowledge should be spread on the record before trial, and out of the presence of the jury, and defendant should be afforded reasonable opportunity to. meet that information. \* \* \*
>
> The entire matter should be aired by a hearing, however informal, but on the record, at the time the custodial authorities propose to bring the accused into court, so as to enable the judge to make his decision out of the presence of the jury panel. *Roberts, supra,* 206 A.2d at 204–205.

The need for such a hearing in the instant case is most obvious. The petitioner has presented to this Court ample evidence upon which this Court has based its belief that the alleged contraband that was found in the petitioner's cell prior to trial was not being used to break jail but was, in fact, being used to construct perfectly innocent items of handicraft for his wife.

Perhaps some of the true facts are lost in the faded memories of the participants, a happenstance which only points out more clearly the need for the trial judge to make a record of the circumstances surrounding the shackling of the petitioner. However, without this record, and in view of the evidence adduced by the petitioner at the evidentiary hearing held in this Court, there can only be the assumption that the trial court erred in allowing the shackling to so occur.

The case of State v. Roberts, *supra,* points out a further infirmity in the trial of this petitioner. The reply of the judge to the request of defense counsel to unshackle his client was "[I]t will

be up to the sheriff." As far as the record in this case shows, the discretion of the judge that the respondent has relied upon was never exercised, but rather was abdicated in favor of the opinion of the custodial authorities. Whatever explanation Judge Pincura may have at this time concerning his decision to allow the shackling of this petitioner, it is insufficient to rebut his unequivocal statements made to defense counsel at the opening of the trial and the proof offered by the petitioner.

> Freedom from shackling and manacling of a defendant during the trial of a criminal case has long been recognized as an important component of a fair and impartial trial. [citing authority] Ordinarily such procedure should be permitted only to prevent the escape of the prisoner or to prevent him from injuring bystanders and officers of the court or to maintain a quiet and peaceable trial. Odell v. Hudspeth, 189 F.2d 300, 302 (10th Cir. 1951).

The petitioner has shown to the satisfaction of this Court that there were no circumstances present in the instant case which would have justified the use of the extreme security method of shackling. There was no "at trial" conduct that indicated in any manner that the petitioner would attempt violence of any sort, and indeed even the pretrial conduct relied upon by the respondent has been shown to be something less than the attempted jail break it was alleged to be. See Dennis v. Dees, 278 F.Supp. 354 (E.D.La.1968).

Finally, the state trial judge, by his own admission, failed to explore reasonable alternative methods of security. In light of the evidence produced at the evidentiary hearing in this court, the exploration of these alternatives may have prevented the prejudice resulting to the petitioner. See *Dennis, supra,* 278 F. Supp. at 357–358.

The inescapable conclusion to be reached in this case is that the defendant could not, under the circumstances

of the "security measures" in this case, have been given a fair and impartial trial as required by the Constitution and the laws of the United States of America.

The import of the findings of fact in view of relevant legal precedent and the standards of due process of law is that concept as embodied in the Constitution of the United States requires this Court to conclude that the shackling of the petitioner during the course of his trial before a jury was a violation of his rights under the due process clause of the Fourteenth Amendment of the United States Constitution.

The Court has resolved the alleged constitutional errors numbered herein as No. 1 (shackling defendant at trial) and No. 8 (exclusion from the jury of persons expressing conscientious objections to capital punishment) in favor of petitioner, and thus the writ will be granted on these grounds.

With respect to the remaining alleged constitutional errors as described herein, the Court decides as follows:

(a) The Court considers that its resolution of error No. 8 renders unnecessary any resolution of error No. 6 (death penalty—cruel and unusual punishment) and error No. 9 (absolute power of jury to impose death penalty).

(b) The Court considers that it is unnecessary to resolve the alleged constitutional errors No. 3 (illegal seizure of evidence) and No. 4 (admission of illegally seized evidence) because if these admissions were constitutional errors at the trial, all constitutional grounds for exclusion of such evidence will be available to defendant at retrial.

(c) The Court considers that if the alleged constitutional error No. 7 (burden of proof re insanity of defendant) and No. 5 (admission or exclusion of defendant's mental condition and jury instruction thereon) were constitutional errors at trial, the trial judge and prosecutor at retrial will be advised in this area and will act accordingly.

Accordingly, the Court makes no decision on the merits of alleged constitutional errors Nos. 2, 3, 4, 5, 6, 7 and 9.

Whereupon, the Court determines that the petitioner's application for a writ of habeas corpus is meritorious and therefore the relief requested in the writ is hereby granted.

Accordingly, it is ordered that the petitioner be and he is hereby remanded to the Common Pleas Court of Lorain County, Ohio for such further proceedings as may be deemed necessary and proper in accordance with law.

It is further ordered that if no action be taken by the State of Ohio or the County of Lorain within 120 days after the filing of this Order, petitioner's release shall be final and unconditional.